**MONARCH CONSTRUCTION COMPANY et al.**

v.

**OHIO SCHOOL FACILITIES COMMISSION et al.**

2002-Ohio-2955.]

Court of Common Pleas of Ohio,
Franklin County.

No. 02CVH04–4222.

Decided May 30, 2002.

250

252

Schottenstein, Zox & Dunn, Roger L. Sabo and Daniel R. Wireman, for plaintiffs.

Arthur J. Marziale, Assistant Attorney General, for Betty D. Montgomery, Attorney General, involuntary plaintiff.

Betty D. Montgomery, Attorney General, and Dan E. Belville, Assistant Attorney General, Education Section, for defendant Ohio Schools Facilities Commission.

Bricker & Eckler, Jack Rosati, Jr., and Sylvia Lynn Gillis, for defendant Tri–Village Local School District.

Kegler, Brown, Hill & Ritter and Donald W. Gregory, for intervening defendant Peterson Construction, Inc.

JENNIFER L. BRUNNER, Judge.

{¶ 1} This matter is before the court upon a complaint filed April 16, 2002, by plaintiffs Monarch Construction Company ("Monarch") and Ronald A. Koetters ("Koetters"), Chairman of the Board of Monarch, the latter plaintiff filing this

action as a taxpayer of the state of Ohio pursuant to common-law doctrine. Plaintiffs named the Ohio School Facilities Commission ("OSFC") and Tri–Village Local School District ("Tri–Village") as defendants in their complaint and subsequently amended their complaint, naming additional parties Peterson Construction Company, Inc. ("Peterson") as an additional defendant and the Attorney General of Ohio as an involuntary party plaintiff.

{¶ 2} A temporary restraining order pursuant to Civ.R. 65 was issued by the court upon the application of the plaintiffs after all parties with the exception of Peterson appeared represented by counsel before the court to present their position. The court concluded that the balancing of the interests was such that temporary relief was appropriate in order to preserve and protect the subject matter of this transaction.

{¶ 3} Generally, this matter involves the award, through a statutorily prescribed competitive bidding process, of a contract to renovate and build an addition to a school building in Darke County, Ohio, for Tri–Village, using in part funds and services supplied by OSFC. The "owner" of the project is jointly Tri–Village and OSFC, and the award decision, pursuant to R.C. 3318.10, is required to be made "by the school district board to the lowest responsible bidder subject to the approval of the commission [OSFC]."

{¶ 4} Plaintiff Monarch submitted the lowest base price bid for the general trades contract for the project, but this contract ultimately was awarded to Peterson. The defendants found that Monarch was not a responsible bidder on this project and therefore not entitled to an award of the contract even though Monarch's base price was the lowest of the bids submitted.

{¶ 5} Shortly after this action was commenced, Peterson moved to intervene. Since Monarch subsequently amended its complaint by interlineation to include Peterson as a defendant, there is no need to decide Peterson's motion, as it is MOOT.

{¶ 6} All defendants have filed answers or a motion in responding to the complaint. A motion to transfer venue was filed by defendant Tri–Village but has been withdrawn on the record, and the parties consented to have the matter heard in Franklin County, Ohio. That motion is therefore not under consideration by this court.

{¶ 7} This matter was heard by the court on preliminary injunction, and during those proceedings, the court granted defendants OSFC and Tri–Village's Motion to Consolidate Hearing on the Application for a Preliminary Injunction with the Trial on the Merits, filed April 29, 2002.[1] Tri–Village's counterclaim was

---

1. Witness testimony presented at trial included Superintendent of Schools of Paint Valley Local Schools, Philip Satterfield; Vice–President of Smoot Construction, Pete Crusse; Execu-

not heard at trial, and the court reserved any trial necessary on the counterclaim until resolution of the issues set forth in plaintiffs' complaint.[2]

{¶ 8}   In their answers, defendants OSFC, Tri–Village, and Peterson admit the following allegations of the complaint:

{¶ 9}   Defendant Tri–Village is a local school district in Darke County, Ohio, which is authorized, pursuant to law in certain instances, to advertise for bids and enter into contracts, including contracts as the agent for the state.

{¶ 10}   Defendant OSFC is an agency of the state of Ohio established by the Ohio General Assembly for the purpose of providing funding to school districts.

{¶ 11}   In December 2000, OSFC entered into a Project Agreement with Tri–Village for construction and renovation of the Tri–Village K–12 Additions and Renovations (the "Project"). The Project is partially funded by OSFC and the remaining portions by Tri–Village.

{¶ 12}   Turner Construction ("Turner") is the Construction Manager for the Project.

{¶ 13}   On March 5, 2002, bids were opened for the Project, which included a series of trade packages. For the general trade contract or package of the Project, there are project specifications. The following pricing was submitted for the general trade contract:

| {¶ 14} | Monarch Construction Company | $6,187,000 |
| {¶ 15} | Peterson Construction Company, Inc. | $6,320,000 |

{¶ 16}   Peterson has previously worked with Turner on other OSFC projects.

{¶ 17}   By letter dated March 15, 2002, Turner stated to Tri–Village that it recommended that Peterson's bid be accepted and that Monarch's bid "does not meet all the requirements of a responsible bidder as listed in the article 3.5.2. of the Instructions to Bidders for this project and based upon their performance on previous OSFC projects."

{¶ 18}   The contract for the general trades package of the Project was awarded to Peterson.

---

tive Director of the Ohio School Facilities Commission, Randall Fischer; Chief of Projects for the OSFC, Crystal Canan; OSFC Project Manager, Cihangir Calis; representatives Dennis Humbel and John Cissell of Turner Construction; Monarch project manager, Doug Grandstaff; President, Thomas Butler; Monarch Vice–President, Marty Meisenberger; and Monarch Chairman of the Board and additional plaintiff, Ronald Koetters; Firestone Jaros Mullin Architect Kevin Harrison; and Peterson Construction's current President Donald Bergfeld.

2.   On May 21, 2002, plaintiffs filed their reply to Tri–Village's and OSFC's counterclaim, asserting the defenses of failure to state a claim upon which relief can be granted, that the actions of Monarch were authorized by and done according to law and were not the proximate cause of Tri–Village's and OSFC's claimed damages, and contributory negligence and assumption of the risk.

{¶ 19} Monarch was the low bidder for the general trades package of the Project.

{¶ 20} Tri–Village relied on the recommendation of Turner in advising Monarch that it was not a responsible bidder.

{¶ 21} The public and the taxpayers of the state of Ohio have a vital interest in having public contracts awarded according to the laws of the state of Ohio and the advertised terms and conditions contained in the bid documents.

{¶ 22} In their complaint, plaintiffs have prayed for an injunction against the defendants and their agents from taking any action that would result in the execution or continued performance of the general trades contract for the Project or cause to be paid any amounts for the contract, and more specifically that any contract award or further performance to Peterson be enjoined. Further, plaintiffs seek that a permanent injunction bar OSFC and Tri–Village from permitting any other contractor than Monarch from receiving a contract or compensation for the general trades contract for the Project.

{¶ 23} The plaintiffs also seek an order from the court that, if any funds of the defendants OSFC and Tri–Village have been paid to anyone in furtherance of the general trades package contract, that the defendants be required to take all actions necessary and appropriate to cause those funds to be returned to the Treasurer of the state of Ohio or the Tri–Village Local School District without delay. Plaintiffs seek declaratory judgment that Monarch was the lowest responsive and responsible bidder for the general trades package contract of the Project and that the actions of OSFC and Tri–Village were improper and invalid as contrary to law, an award of plaintiffs' costs and attorney fees under the taxpayer action cause of action, and any other equitable relief that the court may provide.

{¶ 24} Tri–Village has asserted the affirmative defenses of (1) failure to state a claim upon which relief can be granted, (2) improper venue, (3) waiver and estoppel as to issues not raised at a protest meeting held April 3, 2002, pursuant to R.C. 9.312, and (4) the equitable defense of unclean hands. Peterson has asserted the affirmative defenses of (1) failure to state a claim upon which relief can be granted, (2) improper venue, and (3) that plaintiffs' claims are barred by their own conduct, presumably the defense of estoppel and/or the equitable defense of unclean hands.

{¶ 25} Involuntary party plaintiff Betty Montgomery, in her capacity as Attorney General of Ohio, filed a motion to dismiss her as a party plaintiff pursuant to Civ. R. 21, which provides that parties may be dropped or added by order of the court on motion of any party or of the court's own initiative at any stage of the action and on such terms as are just. The court notes that OSFC is represented by the Ohio Attorney General, who at the same time has been

involuntarily named as a party plaintiff in the action. This creates an irreconcilable conflict for Attorney General Montgomery as relates to the Code of Professional Responsibility. The court agrees with the Attorney General that she is not required to be a party to this taxpayer action, nor does R.C. 2721.12 require that she remain a party to this action ("all persons who have or claim any interest that would be affected by the declaration shall be made parties to the action." Id.). The court finds that the Ohio Attorney General does not have an interest in the declaration of the court in this action. In the interest of justice, and to avoid any professional conflict between the Ohio Attorney General as a party and as counsel to one of the defendants (OSFC), the court hereby GRANTS the Motion to Dismiss of Attorney General Betty D. Montgomery, filed April 30, 2002.

{¶ 26} The three essential causes of action plaintiffs present to the court are (1) declaratory judgment, (2) injunction, and (3) a common-law taxpayer action on behalf of Koetters, an individual, to enjoin the misappropriation of public funds. The findings of the court on declaratory judgment shall govern its decision as to all causes of action of the plaintiffs.

### Declaratory Judgment

{¶ 27} A corporation such as Monarch and an individual such as Koetters are "persons" for the purpose of seeking a declaratory judgment from this court and thereby have standing to do so. R.C. 2721.01. This court may declare rights, status, and other legal relations, whether or not further relief is or could be claimed, and the court's declaration may be affirmative or negative in form and effect, having the effect of a final judgment or decree. R.C. 2721.02. The statutory provisions for declaratory judgment are remedial and are to be liberally construed and administered. R.C. 2721.13.

{¶ 28} Whenever necessary or proper, a court may grant further relief based on declaratory judgment. R.C. 2721.09. A court is prohibited from awarding attorney fees (but it may award costs [R.C. 2721.11]), unless (1) a section of the Revised Code explicitly authorizes a court of record to award attorney fees on a claim for declaratory relief under Chapter 2721 of the Revised Code, (2) the award is pursuant to R.C. 2323.51 (frivolous conduct statute) or the Civil Rules, or (3) an award of punitive or exemplary damages against the party ordered to pay attorney fees. R.C. 2721.16.

{¶ 29} Plaintiffs seek a declaratory judgment that Monarch was the lowest responsible and responsive bidder for the general trades contract of the Project to renovate and build an addition for a school building for Tri–Village and OSFC. Plaintiffs further seek a declaratory judgment that the actions of defendants Tri–Village and OSFC were improper and invalid as contrary to law.

■ {¶ 30} Because R.C. 3318.10, governing the advertising and awarding of construction bids for school construction projects such as this Project incorporates the provisions of R.C. 9.312, the actions of OSFC are not subject to R.C. Chapter 119. Therefore, the standard of review by this court is not whether an agency order is supported by reliable, probative, and substantial evidence and is in accordance with law. R.C. 119.12. Rather, the court must determine an appropriate standard of review in order to determine plaintiffs' claims and the defenses asserted by the defendants.

{¶ 31} This case, being one of first impression, is most factually akin to *Cleveland Constr., Inc. v. Ohio Dept. of Adm. Serv.* (1997), 121 Ohio App.3d 372, 700 N.E.2d 54, decided by the Tenth District Court of Appeals almost four years ago. In *Cleveland Construction,* the trial court had dismissed the appellant public contract bidder's complaint, denying its request for declaratory and injunctive relief against the appellee state agency. The appellant had submitted the lowest bid for a contract through the Ohio Department of Administrative Services ("DAS"), but it was not selected as also being a responsible bidder. The standard of review applied to both DAS's and the trial court's decision was abuse of discretion. The appellate court defined "abuse of discretion" as an "unreasonable, arbitrary or unconscionable attitude." Id. at 387, 700 N.E.2d 54. The appellate court noted that "abuse of discretion connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude." Id., citing *Dayton ex rel. Scandrick v. McGee* (1981) 67 Ohio St.2d 356, 359, 21 O.O.3d 225, 423 N.E.2d 1095. The court further defined "arbitrary" as "being 'without adequate determining principle; * * * not governed by any fixed rules or standard.'" *Cleveland Construction* at 387, 700 N.E.2d 54, citing *Dayton ex rel. Scandrick* at 359, 21 O.O.3d 225, 423 N.E.2d 1095. The court further defined "irrational" to mean "unreasonable." *Cleveland Construction* at 387, 700 N.E.2d 54, citing *Dayton ex rel. Scandrick* at 359, 21 O.O.3d 225, 423 N.E.2d 1095.

■ {¶ 32} In *Cleveland Construction,* the court noted that a state agency such as DAS is empowered to make a qualitative determination as to which bid is both lowest and best. Id. The court determined this power to be discretionary. Id. Therefore, this court finds that the standard of review of the actions of defendants OSFC and Tri–Village is an abuse of discretion standard. Since R.C. 3318.10 requires each of these defendants to separately make a decision on awarding a contract such as the general trades contract at issue, each must decision be reviewed independently.

■ {¶ 33} Under R.C. 2721.03 of the declaratory judgment statutes, the court has the power to determine "any question of construction or validity" that arises out of statute or contract that affects persons' rights, status, or other legal

relations. The court must review the *actions* or decision-making process of defendants, Tri–Village and OSFC, for abuse of discretion (*Cleveland Construction*), but it cannot to so far as to declare that Monarch is the lowest responsive and responsible bidder. That is a discretionary function of defendants Tri–Village and OSFC, and the court cannot substitute its own discretion for that of these defendants.

{¶ 34} Therefore, as a matter of law, the court may determine only the issue of whether defendants Tri–Village and OSFC abused their discretion in the awarding of the general trades contract for the Project to Peterson and in determining Monarch not to be a "responsible" bidder pursuant to that term as it is used in R.C. 3318.10, 3313.46, and 9.312, pursuant to the prayer for declaratory judgment whether the actions of defendants Tri–Village and OSFC were improper and invalid as contrary to law.

### Factual Findings on Actions of OSFC in Approving Peterson's Contract

{¶ 35} Issues of fact may be tried and determined upon declaratory judgment in the same manner as in other civil actions. R.C. 2721.10. The court hereby adopts all of the allegations of the complaint admitted to by the defendants as findings of fact for the purposes of rendering declaratory judgment. The court further finds as follows.

{¶ 36} Substitute Senate Bill No. 102 of the 122nd General Assembly of the Ohio legislature was enacted in part (R.C. 3318.30) to create the Ohio School Facilities Commission ("OSFC"). The stated purpose of the OSFC is to "provide financial assistance to school districts for the acquisition or construction of classroom facilities in accordance with sections 3318.01 to 3318.31 of the Revised Code." Id. The enabling statute provides:

{¶ 37} "The commission is a body corporate and politic, an agency of state government and an instrumentality of the state, performing essential governmental functions of this state." Id.

{¶ 38} This statute further expressly provides that the OSFC performs "essential public functions and public purposes of the state." Id.

{¶ 39} Of the OSFC's seven members, only three are voting members, who are the director of the state Office of Budget and Management ("OBM"), the director of DAS, and the superintendent of public instruction, or their designees. The other members, who are nonvoting, are two members of the Ohio Senate and two members of the Ohio House of Representatives, with the members from each chamber of the legislature being from opposing political parties.

{¶ 40} Members of the OSFC serve without compensation, consistent with R.C. 102.03. Two voting members of the OSFC constitute a quorum, "and the

affirmative vote of two members is necessary for approval of any action taken by the commission." R.C. 3318.30(B). The OSFC must adopt rules pursuant to R.C. 111.15 for the "conduct of its internal business and shall keep a journal of its proceedings." Id. The OSFC is required by law to meet at least once each calendar quarter. Id.

{¶ 41} R.C. 3318.10 is a law that is administered by the OSFC pursuant to its powers as set forth in R.C. 3318.30. Pursuant to Am.Sub.H.B. No. 94 of the 124th General Assembly, effective December 13, 2001, the Ohio legislature amended R.C. 3318.10, which governs the advertising and awarding of construction bids to provide that the provisions of R.C. 9.312 and 3313.46 apply to construction contracts for OSFC projects. Am.Sub.H.B. No. 94 also amended R.C. 3318.31 to statutorily create the position of executive director to serve at the pleasure of the commission. As for the responsibilities of the executive director, division (B) of that section specifically provides: "The executive director shall supervise the operations of the commission."

{¶ 42} On February 18, 1998, prior to the aforestated amendments contained in Am.Sub.H.B. No. 94, OSFC adopted a resolution authorizing and directing the chairperson of the OSFC, or the executive director, if authorized by the chairperson in writing, "to do, or cause to be done, all such acts and things and to execute and deliver, or cause to be executed and delivered, all such agreements, documents, instruments or certificates, in the name of and on behalf of the Commission, as the Chairman or the Executive Director may deem necessary or appropriate to carry out the intent of the foregoing resolution." (Ex. E.) The apparent intent of the resolution of February 18, 1998, was to "carry out the purposes of the Classroom Facilities Assistance Program" and "distribute funds appropriated by the General Assembly for construction of new school buildings, reconstruction and renovations of existing school buildings." The resolution further provided:

{¶ 43} "The taking of such action or the execution of any such agreements by the Chairman or the Executive Director shall be conclusive evidence of the exercise of the discretionary authority conferred herein." (Sec. 1, Ex. E.)

{¶ 44} On February 19, 1998, Sandra Drabik, chairperson of the OSFC, executed a memorandum regarding "delegation of signature authority: Classroom Facilities Assistance Program, Ohio School Facilities Commission." Her specific authorization to Mr. Fischer was as follows:

{¶ 45} "I, Sandra A. Drabik, Director of Administrative Services, in my capacity as Chairman of the Ohio School Facilities Commission, do hereby authorize you, Randall A. Fischer, as Executive Director of the Ohio School Facilities Commission, to execute, in your name, any contracts, agreements, documents, instruments or certificates which may be necessary for the adminis-

tration of the Classroom Facilities Assistance Program as expressed by Resolution adopted on February 19, 1998 by the Ohio School Facilities Commission."

{¶ 46} Thereafter, on April 15, 1999, Thomas Johnson, as acting interim chairman of the OSFC, granted to Randall Fischer "as part of your responsibilities in representation of the OSFC, the authority to sign for me, in your name any contracts, agreements, documents, instruments or certificates which may be necessary for the administration of the Classroom Facilities Assistance Program as expressed by Resolution adopted on April 8, 1999 by the Ohio School Facilities Commission." No resolution of April 8, 1999, was offered into evidence by any of the defendants. Exhibit 46 contains the minutes of the OSFC, which are devoid of any reference to the passage of a resolution by OSFC that is referenced in Exhibit D. Thomas Johnson subsequently became the chairperson of the OSFC and has served in that capacity for the period of time at issue relating to the bidding and awarding of the general trades contract of the Project. No further authorization has been issued to Randall Fischer by Thomas Johnson as chairperson of the OSFC, and none has been issued pursuant to any resolution of the OSFC.

{¶ 47} No other evidence of Randall Fischer's apparent authority to sign and execute contracts or exercise the "discretionary authority" of the OSFC has been offered into evidence. Nor has the OSFC issued any rules or regulations pursuant to its mandate in R.C. 3318.30(B). Nor has any policy directive been issued by the voting members of the OSFC. The court finds that Randall Fischer has no authority, either apparent or actual, to approve contracts on behalf of the OSFC.

{¶ 48} No contract of the OSFC has ever been approved by the voting members of the OSFC. Per the testimony of Randall Fischer, as of June 2002, the OSFC will have executed more than 1,700 contracts on behalf of the state of Ohio and distributed $2 billion dollars of state funds for school construction projects.[3] The OSFC in its history has rejected the lowest bidder only six to eight times. A contract with defendant Peterson was executed April 10, 2002, Peterson having been found by defendants Tri–Village and OSFC to be the lowest responsive and responsible bidder for the general trades contract of the Project.

{¶ 49} The Tri–Village Local School District is located in Darke County, Ohio, in a predominantly rural area where local tax revenues to support schools have

---

3. These funds are derived from end-of-year cash balances and interest earned on bond sales, tobacco settlement funds placed into the Education Facilities Endowment Fund (R.C. 183.27), and/or the Education Facilities Trust Fund (R.C. 183.26), and the state's biennial capital budgets, being bond funds.

been limited. A school building in use by Tri–Village in New Madison, Ohio, was built in 1927 and currently houses 400 elementary students in a space designed for 200 students. Over 800 students will be served by a renovated and expanded K–12 building that is the subject of the Project.

{¶ 50} In the year 2000, Tri–Village applied for a grant from the OSFC to fund a renovated and expanded K–12 building under OSFC's Exceptional Needs Program, a program based on need and condition of facilities. Tri–Village's application was not approved in the initial Exceptional Needs Program award process, for which twelve other projects were named, but, ultimately, the OSFC agreed in a second round of awards to fund sixty percent of the cost of a new school facility for grades K–12.

{¶ 51} Prior to OSFC action, Tri–Village had submitted three unsuccessful bond issues to the voters of the school district in the last ten years (1990, 1994, and 1997) for the Project now at issue. At an election held on November 7, 2000, the voters approved a 5–mill bond issue, after the district's application for sixty percent funding from OSFC.

{¶ 52} As a result of the November 7, 2000 election approving the issuance of bonds by the district, OSFC and Tri–Village entered into a Project Agreement for both renovations and additions to the middle and high schools and to house K–12 grades. Certain demolition work is also to be performed. OSFC's share of the budget is approximately $8.9 million. The school district's share is approximately $5.7 million.

{¶ 53} This Project Agreement was entered into, with the parties signing the contract on separate dates in November and December 2000. Tri–Village entered into this contract through its school board president and treasurer, whose signatures evidenced that the contract had been approved at a duly called meeting of the school board. OSFC entered into this contract purportedly through its chairperson, Thomas Johnson, and through Randall Fischer, its executive director. Fischer personally signed as executive director and also signed Thomas Johnson's name to the Project Agreement on December 20, 2000. Attached to the Project Agreement was a copy of the Resolution of the Board of Education of Tri–Village School District Board authorizing entering into such an agreement (Ex. 1).

{¶ 54} The Project Agreement was entered into pursuant to R.C. 3318.08, which governs the written agreements between the OSFC and school district boards for the construction Project. Pursuant to R.C. 3318.08(H), the agreement must authorize the school district board to advertise for and receive construction bids for the project for and on behalf of the OSFC, and to award contracts in the name of the state "subject to approval by the commission." Ownership of a project during the period of design and construction is shared between the OSFC

and the school district board, according to their respective contributions. (Ex. 1, at II.A.) These conditions, among others, governed the Project Agreement between OSFC and Tri–Village for the Project.

{¶ 55} Under the terms of the Project Agreement between OSFC and Tri–Village, Tri–Village was required to select a Project architect, subject to the approval of the OSFC. R.C. 3318.091. Tri–Village selected Fanning/Howey Associates, Inc. ("F/H") as architect for the project. With regard to bid opening and review of bids received for responsiveness, F/H's responsibilities were to assist the construction manager, review all bids received for responsiveness, participate in investigating the responsibility of bidders, and deliver a written recommendation of F/H and the construction manager to Tri–Village and OSFC about the award of, rejection of, any bid or bids for the general trades contract of the Project "in accordance with applicable law." (Ex. 3, at 2.6.3.) F/H's evaluation responsibilities extended to "alternates" as well. "Alternates" are specific construction or renovation components of the Project that are not included in the base price of a bid, but are bid separately and funded solely by the school district, at the school district's option. Whether or not alternates are funded is not, by practice, determined until the time of contract award based on a bid's base price. Therefore, even though a bidder's base price bid may be the lowest, its alternates may result in the overall bid being higher than the second lowest bidder's overall price, and this practice was permitted in regard to the bid for the general trades construction contract for the Tri–Village Project.[4]

{¶ 56} Under the Project Agreement (Ex. 1), OSFC was required to select a "construction manager" in accordance with R.C. 9.33, which governs construction management services. A "construction manager" is a statutorily defined term which means "a person with substantial discretion and authority to plan, coordinate, manage, and direct all phases of a project for the construction, demolition, alteration, repair, or reconstruction of any public building, structure, or other improvement, but does not mean the person who provides the professional design services or who actually performs," the enumerated services. R.C. 9.33. OSFC selected Turner Construction Company ("Turner")[5] as the construction manager of the Tri–Village Project, but the record contains references to services being

---

**4.** Monarch's total bid package with selected alternates was $7,021,000, and Peterson's was $7,223,900, leaving Monarch as the low bidder when comparing base price bids along with alternates.

**5.** Turner has been the construction manager for St. Henry High School and Elementary School, Mississinawa Valley K–12 School, Continental Elementary School, and Ft. Recovery PK–8 School, all OSFC projects for which Peterson was the general trades contractor with completion dates from June 2000 through August 2002. (Ex. 14 and trial testimony.) See, also, Ex. 41, p. 118.

provided by "Turner/Wise Construction." (See, e.g., Ex. 3 and 17.) Testimony at trial clarified that the contract is with Turner only.

{¶ 57} The Agreement for Construction Management Services with Turner was signed only by Randall Fischer, as executive director of OSFC, a year prior to the contract at issue, on April 9, 2001. Tri–Village's agreement with F/H was signed for Tri–Village by its president and treasurer, and approval of the OSFC (pursuant to R.C. 3318.091) was signed by Randall Fischer, as executive director of OSFC, March 19, 2001. None of the minutes of the OSFC (Ex. 46) indicates that the OSFC members approved any of these contracts (by at least two affirmative votes).

{¶ 58} On April 10, 2002, after Tri–Village had rejected Monarch as not being a responsible bidder and awarded the contract to Peterson (which had occurred the evening of April 9, 2002), Randall Fischer signed a letter to the superintendent of Tri–Village that read as follows:

{¶ 59} "This letter is to officially communicate *my approval, on behalf of the Ohio School Facilities Commission,* of the decision to affirm the earlier determination to reject the low bid of Monarch Construction Company. * * * The basis for the *Commission's approval* of the Board's action is a *determination* that Monarch is not responsible." (Emphasis supplied.) (Ex. 35.)

{¶ 60} The OSFC's minutes (Ex. 46) reflect no approval of this action by the OSFC or any determination by OSFC's members that Monarch was not a responsible bidder. Peterson signed a contract with Tri–Village for the general trades construction contract the same evening as the school board approved it on April 9, 2002.[6] The contract was prior to the time the purported approval by the OSFC was conveyed by letter to Tri–Village.

### Conclusions of Law Regarding OSFC Approval of Peterson's Contract

{¶ 61} All parties concede in the complaint and their answers that "[t]he public and the taxpayers of the State of Ohio have a vital interest in having public contracts awarded *according to the laws of the State of Ohio* and the advertised terms and conditions contained in the bid documents." (Emphasis added.) R.C. 3313.30 provides that the *commission* may, in its own name, enter into contracts, and that the "affirmative vote of two members is necessary for approval of *any* action taken by the commission." R.C. 3318.30. The record is devoid of any evidence that OSFC followed the requirements of the law in approving the award of the contract to Peterson, who was not the lowest bidder for the general trades contract of the Project.

---

6. Representatives of Peterson were called to attend the school board meeting and sign the general trades construction contract just following the meeting.

{¶ 62} In determining the effect of a state agency's failure to follow the law or its own procedures in the approval of a state contract, the Tenth District Court of Appeals has found that the defects that occur must be of such a character that they not only prejudice the rights of the plaintiff but are also "so significant that they threaten the basic integrity" of the agency and its procedures. *Control Data Corp. v. Controlling Bd. of Ohio* (1983), 16 Ohio App.3d 30, 36, 16 OBR 32, 474 N.E.2d 336.

{¶ 63} In *Control Data Corporation*, the Controlling Board of Ohio waived competitive bidding requirements under its authority to do so pursuant to law. The contract at issue was between the Ohio State Lottery Commission and General Instrument Corporation for the purchase of computer equipment and equipment maintenance services. The plaintiffs included a competitor of the contract awardee and three members of the Controlling Board. At issue was the failure by the Controlling Board to follow the requirements of R.C. 127.16, which provided, "Upon the request of either a state agency or the director of budget and management *and after the controlling board determines that an emergency or a sufficient economic reason exists*," (emphasis added), the Controlling Board could act to waive competitive bidding and approve the contract.

{¶ 64} In *Control Data*, the plaintiffs alleged that no determination was made by the Controlling Board, by separate vote, that an emergency existed to waive competitive bidding. The plaintiffs further contended that the Controlling Board violated its established procedures in approving the contract.

{¶ 65} The appellate court noted that it was clear that the Controlling Board failed to fully abide by its own procedural guidelines but that strict compliance was not the rule. The court reiterated that "the plaintiff must be able to demonstrate either that the procedural defects that occurred were so substantial that the basic integrity of the Controlling Board and its operations was threatened or that the defects were of such a nature that the plaintiff was prejudicially affected." Id. at 39, 16 OBR 32, 474 N.E.2d 336.

{¶ 66} Neither the trial court nor the appeals court could find such defects in procedure.

{¶ 67} Comparing this standard to the facts at this case, the court finds that the procedures with which the OSFC were to comply were explicitly set forth in its enabling statute; there was no failure to abide by procedural regulations (since the OSFC has promulgated none, despite the specific statutory mandate to do so in R.C. 3318.30). R.C. 3318.30 requires that "the affirmative vote of two members is necessary for approval of any action taken by the commission." Only the February 18, 1998 resolution could be taken to "amplify" this mandate, which resolution further requires written authorization by the chairperson of the OSFC. Such delegation by the means attempted violates R.C. 3318.30, since that section

requires the OSFC to promulgate rules pursuant to R.C. 111.15 for the conduct of its activities. The state's rulemaking process is one that carries significantly more procedural safeguards than a resolution adopted at a single meeting of the OSFC. Agency rules are subject to a prescribed process where adequate opportunity is provided for the public to comment on the proposed rules. Final approval of the rules is subject to the decision of the Joint Committee on Agency Rule Review, a quasi-legislative body who reviews them for conformity with the enabling statute(s). (See R.C. 119.01 et seq.)[7]

{¶ 68} The only evidence offered by OSFC that Randall Fischer had authorization to exercise the OSFCs discretionary powers (see Ex. B, D, and E) expired when Sandra Drabik, DAS director, resigned her position on OSFC in 1999. Any further purported authorization was (1) according to a resolution of the commission for which there is no direct or circumstantial evidence, and (2) on behalf of Thomas Johnson only as interim chairperson for the OSFC, but not subsequently as its chairperson.[8] More important, the court finds as a matter of law that since R.C. 3318.30 required the OSFC "adopt rules pursuant to section 111.15 of the Revised Code for the conduct of its internal business," which OSFC has *never* done, any resolution purporting to delegate the commission's discretionary, voting authority to its executive director is in direct violation of its enabling statute, R.C. 3318.30. Any such resolution and/or further written delegation fails as a substitute for the bonafide rulemaking and review processes of R.C. 111.15 and 119.01 et seq. with which is integrated the right of thorough public scrutiny. Moreover, any such resolution and/or further written delegation is *not* a substitute for a validly promulgated rule and is invalid. R.C. 119.02.

---

7. R.C. 119.02 provides: "Every agency authorized by law to adopt * * * rules shall comply with the procedure prescribed by sections 119.01 to 119.13, inclusive, of the Revised Code, for the adoption * * * of rules. Unless otherwise specifically provided by law, the failure of any agency to comply with such procedure shall invalidate any rule or amendment adopted, or the rescission of any rule."

8. {¶ a} It should be noted that the April 9, 1999 meeting of the OSFC was its yearly organizational meeting (see R.C. 3318.30). The minutes read: "Dr. Zelman nominated Director Johnson to act as Chairman of the Commission in light of the fact that Chairman Drabik is resigning her position with the Department of Administrative Services. Director Drabik clarified that Director Johnson's appointment as Chair would be interim until all Commission members are named. Dr. Zelman moved to approved [sic] Director Johnson as interim chairman of the Commission, Chairman Drabik seconded. Roll call vote was taken as follows: Dr. Zelman, Director Johnson, Chairman Drabik, aye. The motion passed with all ayes."

{¶ b} At that meeting the voting members of the OSFC voted on the membership of an evaluation team for school district applicants for the OSFC's Exceptional Needs Program, the awarding of a grant to Hamilton City Schools for a fire at its junior high school, and the approval of Thomas Johnson as interim chairperson for the OSFC. No other votes of OSFC members appear in the minutes.

{¶ 69}   The OSFC asserts that recent amendments to R.C. 3318.31 specifically require the executive director of OSFC to "supervise the operations of the commission." OSFC asserts that this statutory amendment (requiring the executive director "to supervise") now authorizes the executive director to *approve* contracts for construction projects using OSFC funds. The court disagrees.

{¶ 70}   R.C. 1.52 provides:

{¶ 71}   "(B) If amendments to the same statute are enacted at the same or different sessions of the legislature, one amendment without reference to another, the amendments are to be harmonized, if possible, so that effect may be given to each.   * * * Amendments are irreconcilable only when changes made by each cannot reasonably be put into simultaneous operation."

{¶ 72}   In harmonizing R.C. 3313.30 and with the recent amendment to R.C. 3313.31, the court finds that the executive director of the OSFC can supervise its operations, and the voting members of the commission can approve any action taken by the commission, and these operations can occur simultaneously. The court notes that pursuant to the recent amendments to R.C. 3318.31, the executive director of the OSFC serves at the pleasure of the commission. His status is such that if the members of the OSFC are displeased with his performance, he may be dismissed.[9]

{¶ 73}   Am.Sub.H.B. No. 94 (124th General Assembly), effective December 13, 2001, removed from the duties of the commission the employment and fixing of compensation of its employees, all of whom previously served at the pleasure of the commission. Now the commission employs and fixes the compensation of only the executive director. The responsibility for the commission's other employees was transferred to the executive director with power identical to that previously held by the commission, including that its employees now serve the commission at the pleasure of the executive director.

{¶ 74}   Prior to being amended, R.C. 3318.31 provided that the commission may "make and enter into all contracts, commitments, and agreements, and execute all instruments, necessary or incidental to the performance of its duties and the execution of its rights and powers under Chapter 3318. of the Revised Code." This did not change with the enactment of Am. Sub. H.B. No. 94. Had the legislature intended that this power or duty be transferred to the executive director, it had the opportunity to do so in amending this section in Am. Sub.

---

9. In the case of *Smith v. Fryfogle* (1982), 70 Ohio St.2d 58, 59, 24 O.O.3d 114, 434 N.E.2d 1346, the Ohio Supreme Court interpreted the meaning of the position to "serve at the pleasure of" in regard to a township police chief position. "This first path is clear and unequivocal. It gives the appointing body unilateral authority to terminate the chief of police without considerations of cause or reason."

H.B. No. 94. It did not, and the court cannot agree with the interpretation offered by the OSFC.

■ {¶ 75} Further guidance on this can be gleaned from an analogous situation in *Cuyahoga Falls v. Robart* (1991), 58 Ohio St.3d 1, 5–6, 567 N.E.2d 987, wherein a city charter provided that the law director of the city represent it in all lawsuits. ("[T]he affirmative vote of two members is necessary for approval of *any* action taken by the commission." R.C. 3318.30(B).) In *Robart*, the court found that the city had no authority to provide for the hiring of outside counsel in place of the law director to act on the city's behalf in any particular litigation, unless some disqualification, illness, or absence of the law director occurred, and the court found that none had occurred. The authority of the OSFC to approve actions of the commission such as entering into contracts by OSFC in its own name (an enumerated power of the commission, in "performing essential governmental functions of this state") similarly cannot be delegated to its executive director.

{¶ 76} Nor can Randall Fischer be said to be a "public officer" and thereby imbued with the authority to take OSFC actions, such as approving contracts. Even though his position is now recognized by statute, he serves at the pleasure of the commission.

■ {¶ 77} A "public officer," in contrast to a public employee, is invested by law with a portion of the sovereignty of the state and is authorized to exercise functions of an executive, legislative, or judicial character for the benefit of the public. See *Lordstown ex rel. Kibler v. Craigo* (June 30, 1994), Trumbull App. No. 93–T–4919, 1994 WL 321109, citing *State ex rel. Milburn v. Pethtel* (1950), 153 Ohio St. 1, 41 O.O. 103, 90 N.E.2d 686.[10] "Additional criteria for determining that a position constitutes a public office include election, oath of office, bond, and statutorily prescribed duties which involve governmental functions." *Lordstown ex rel. Kibler*, citing *State ex rel. Landis v. Butler Cty. Bd. of Commrs.* (1917), 95 Ohio St. 157, 159, 115 N.E. 919.

{¶ 78} The language of R.C. 3318.31 specifies that the executive director of the OSFC is an employee of the OSFC who "shall serve at the pleasure of the commission." Fischer testified at trial that "I work for the Ohio School Facilities Commission, but I'm not a member of actual commission itself, no." Randall Fischer is not a public officer, and he has no authority to act for the commission in carrying out its discretionary duties, such as approving contracts required by statute to be approved by the commission. R.C. 3318.30.

---

10. "It has long been held that the relationship between a public officer and the government is not *ex contractu* but *ex lege*." *Lordstown ex rel. Kibler*, citing *State ex rel. Gordon v. Barthalow* (1948), 150 Ohio St. 499, 38 O.O. 340, 83 N.E.2d 393.

■■■ {¶ 79}   There are no statutory requirements for an oath of office or bond of the executive director of the OSFC, nor are there any procedural rules adopted by the OSFC that would require either of these safeguards to protect the public interest in the disbursement of some $2 billion dollars.   This court can only conclude that the executive director of the OSFC has no authority to perform its statutorily prescribed duties such as the approval of school construction contracts and that such approval must be by a vote of the commission.

■■■ {¶ 80}   The court finds as a matter of law and based on evidence that is clear and convincing that the defect in the approval process by the OSFC is so substantial that the basic integrity of the OSFC and its operations are threatened.   *Control Data.*[11]   Further, there is no doubt that plaintiff Monarch is prejudiced by the unlawful actions of the OSFC.[12]

{¶ 81}   Nearly $2 billion of public money have been distributed through more than 1,700 contracts for the construction and renovation of schools throughout the state of Ohio, not one of which has been approved by a vote of the commission. The final word on all of these contracts has lain with one individual, who is not a public officer, has not taken an oath of office, nor is bonded.   The public education of the state's children, an essential government function, is threatened by the unbridled discretion unlawfully placed in the hands of one person, Randall Fischer.   This is unconscionable.[13]   The court finds as a matter of law that OSFC has not only unlawfully approved the rejection of Monarch, it has abused its discretion in so doing.[14]

---

**11.** {¶ a}   As noted in *Rein Constr. Co. v. Trumbull Cty. Bd. of Commrs.* (2000), 138 Ohio App.3d 622, 631, 741 N.E.2d 979:

{¶ b}   "[W]hile delays in a public project may be undesirable, that potential harm does not outweigh the harm suffered by the public generally when public contracts are unlawfully awarded."

**12.**   Monarch has never been found since its inception in 1963 to be a nonresponsible bidder. Numerous witnesses testified that a finding of nonresponsibility is a serious matter that can have an effect on awards of future contracts to such a bidder (e.g., testimony of Pete Crusse from Smoot Construction, Dennis Humbel from Turner Construction, Tom Butler and Ronald Koetters from plaintiff Monarch, and even implied in Don Bergfeld's testimony from Peterson).

**13.**   When a provision of a contract is found to be "unconscionable," it is so fundamentally unfair that it is unenforceable.   *Trupp v. State Farm Mut. Auto. Ins. Co.* (1989), 62 Ohio App.3d 333, 341–342, 575 N.E.2d 847.

**14.**   The court notes that the three voting members of the OSFC are the directors of DAS and OBM and the state superintendent of schools, or their designees.   It was argued at trial that these are very busy people and that it is logical that the executive director of the commission could carry out this function for the commission members.   These voting members may designate someone to attend meetings on their behalf, and Ex. 46, the minutes, show that they have at times done so, but the designee has not been Randall Fischer, but, rather, someone

{¶ 82}   That this process is called "competitive bidding" does not minimize the seriousness of the state's failure to act lawfully or alleviate the duty of the commission to exercise its discretion.   Calling this process "competitive bidding" is a sham because (1) the determination of responsibility necessarily involves significant discretion, *Cleveland Construction,* R.C. 9.33, and (2) a prospective contractor's bids on alternatives for construction are not part of the base contract price but are subject to the approval of the OSFC after the school district selects alternatives *at the time of contract award.*   This leaves even the lowest bidder at the mercy of an arbitrary decision of the school district with the approval of the OSFC, to select alternates to be built (which ultimately modify the base price bid) after they know the base price bids of all the bidders.   (See Ex. 5, at 3.4.1.) Using this process the lowest base price bidder can be "edged out" by the second lowest base price bidder if the school district (with the approval of the OSFC) selects alternates that would cause the second lowest bidder to become the lowest bidder.   Not specifying which alternates are to be built *until the time of contract award* is an arbitrary practice,[15] especially in light of the requirements of the construction manager to create a pre-bid budget and revise it during the bidding and award process, as is contained in the Construction Manager Agreement. (Ex. 2.)

{¶ 83}   The failure of the OSFC to follow statutory mandates in approving the general trades construction contract for the Project at Tri–Village renders the Peterson contract per se void ab initio.[16]   See *Allied Delivery Sys. Co. v. Hamilton* (Apr. 1, 1982), Franklin App. No. 81AP–727, 1982 WL 4078 ("Since plaintiffs-appellants were not the "lowest and best" bidders, in awarding the contract to it, state purchasing exceeded its authority as limited and restricted by R.C. 125.11, and thereby entered into an illegal contract which was void *ab initio*

---

from their own agency to represent the unique interests of that agency on the commission. Second, Randall Fischer and Crystal Canan testified that they formerly were the State Architect and legal counsel respectively, both within the office of DAS.   *Cleveland Construction* involved the award of a contract by DAS.   The court believes that placing the decision in part in the hands of a department experienced with the nuances of awarding state construction contracts was not an accident.   OBM is the primary budget agency for the state of Ohio, while the state superintendent of schools oversees education for the state of Ohio.   The court believes that the legislature wisely selected these three individuals (specifically omitting its own members of the legislature) to oversee *and vote on* the fair award of contracts for the building of school facilities to provide for equal education of the state's children.   R.C. 3318.30 is unequivocal that a vote of the commission (by at least two affirmative votes) is necessary for the approval of *any* action of the commission.

15. An "arbitrary" decision is one that is without adequate determining principle or not governed by any fixed rules or standards.   *Cleveland Construction* at 387, 700 N.E.2d 54.

16. Note that OSFC approved only the *rejection of Monarch* and never approved the selection of Peterson as the general trades contract awardee.   (Ex. 35.)

and unenforceable from the date of its inception."). Id. at 10. The contract with Peterson is void ab initio as a matter of law.[17]

{¶ 84}   The plaintiffs ask this court to further declare that defendant *Tri–Village* could only execute the contract with Peterson when it had obtained OSFCs prior approval of the award.   Plaintiffs urge on the court the interpretation of the statute that "subject to the approval of the commission" as is set forth in R.C. 3318.10 means that no award can be made by the school district on behalf of the state until the state has approved it.   The court finds that this is a strained interpretation and rejects it.

{¶ 85}   In doing so, the court relies on *Ratchford v. Proprietors' Ins. Co.* (1989), 47 Ohio St.3d 1, 3–4, 546 N.E.2d 1299, for which the syllabus is as follows:

{¶ 86}   "In a statutory liquidation of an insolvent insurance company, former R.C. 3903.07 authorizes a court of common pleas to withhold approval of the sale, by the statutory liquidator, of real property of the insolvent company only where there is a finding of fraud or abuse of discretion on the part of the liquidator."

{¶ 87}   The court stated that the merit issue before it "involves the operative words 'subject to the approval of the court.'"   A central issue in *Ratchford* was whether these words give a trial judge the right to disapprove "an otherwise validly-secured and entered-into purchase contract or is the trial judge limited to

---

**17.**   {¶ a}   Moreover, the Peterson bid was nonresponsive.   Peterson, for Alternate 13, typed in the words, "no bid."   (See Ex. 59, at p. BF–4.)   All other alternate pricing was handwritten.   "No bid" was typed in for the other prime contracts for the project for which Peterson was not bidding.   The court construes that "no bid" in this situation means, in plain terms, that Peterson was not submitting a bid on this alternate, in violation of Instructions to Bidders (Ex. 5).   The other defendants have evidently chosen to "overlook" this omission.   The indication of a zero ($0) or "no change" (as did Monarch, Ex. 39) on the bid form would have indicated that if this bidder were to receive the bid, its price on this alternate would be nothing.   "No bid" means the bidder does not bid on it.

{¶ b}   While Peterson argues that "no bid" means no cost for this alternate, that is an after-the-fact argument and is not consistent with the rest of its bid document.   To allow Peterson to amend its bid now and specify that "no bid" means "no cost" creates a competitive advantage when both Peterson and Monarch were the subject of scope review meetings the same day with Turner.

{¶ c}   Under 3.4.3 of Instructions to bidders (Ex. 5), Tri–Village reserves the right to waive, or allow any bidder a reasonable opportunity to cure "a minor irregularity or technical deficiency in a bid, *provided the irregularity or deficiency does not affect the bid amount or otherwise give the Bidder a competitive advantage.*"   (Emphasis added.)   Clearly the apparent curing of this obvious defect by Tri–Village (after the fact) has given Peterson a competitive advantage.   It is in effect a re-pricing of its bid after comparing it to that of a lower-priced competitor, Monarch.   (Compare Ex. 59, Peterson's bid, with Ex. 39, Monarch's bid.)

{¶ d}   "For a bid to be responsive, R.C. 9.312 requires that it respond to the bid specifications in all material respects and that it contain no irregularities or deviations that would affect the amount of the bid *or otherwise give the bidder a competitive advantage.*"   (Emphasis added.)   *W.C.I. v. Ohio Bldg. Auth.* (Aug. 4, 1994), Franklin App. No. 93APE11–1583, 1994 WL 409780.   It is a material omission not to bid on a required item, such as alternate 13.

determining if the procedures leading to the agreement were in accordance with law and free from fraud or abuse of the liquidator's discretion?" Id. at 4–5, 546 N.E.2d 1299. The court stated that it believed the intent of the General Assembly, as expressed in the statutory scheme, was to give a liquidator broad authority to dispose of assets of an insolvent insurance company, subject only to judicial review to ensure no fraud or abuse of discretion in the process. Id. at 5, 546 N.E.2d 1299. The court noted that case precedent on this issue was "sparse." Id. at 10, 546 N.E.2d 1299. This court finds the same to be true in this case.

{¶ 88} At the trial of this matter, Crystal Canan, an attorney who is Chief of Projects for OSFC, testified that she had advised Randall Fischer that in determining whether to "approve" a school district's contract award decision OSFC must determine whether there is an abuse of discretion by the school district. (Ex. 48, p. 2.) [18] The court agrees with OSFC staff's determination that its role in approving contract awards by school districts is to review the award using an abuse of discretion standard.

{¶ 89} In applying the holding of the court in *Ratchford*, the court recognizes that there is a difference between the nature of a liquidation of an insurance company by a court-appointed liquidator, "subject to the approval of the court," and the awarding of a construction contract by a school district, "subject to the approval of the OSFC." The court recognizes that OSFC's involvement is significantly greater throughout the process by which a school district awards contracts [19] than is a court's in the liquidation of an insurance company. However, the parties to the Project Agreement explicitly recognize that ultimately, absolute ownership of the Project will vest in the school district. (Ex. 1, at II.C.) It is for this reason that the court leans toward the use of and relies on *Ratchford* in determining the meaning of "subject to the approval of the commission" as is set forth in the statute and various contracts executed to carry forward the Project. (See, e.g., Ex. 1.) Therefore, it was not necessary for OSFC approval to take place before Tri–Village voted to award the contract to

---

18. The court notes, however, that the "abuse of discretion" standard urged by Canan is determining "whether there was bad faith, fraud or malice involved in the evaluation process, or more plainly, whether the people performing the evaluation and making a recommendation had some personal motivation to find Monarch is not responsible that is unrelated to their public responsibilities." (Ex. 48, p. 2.) Such a standard is a subjective standard, as bad faith, fraud, or malice involve some form of subjective intent. The standard adopted by the court in *Cleveland Construction* is an objective standard, which involves the observation of behavior that can be determined to be an unreasonable, arbitrary, or unconscionable attitude.

19. E.g., the forms of agreement with architect and contractors for various phases of a project were required to be OSFC forms, and Tri–Village was required to use an OSFC-selected construction manager.

Peterson. However, any award by Tri–Village to Peterson was subject to OSFC approval, and no contract with Peterson was valid without it. Since subsequent OSFC "approval" was unlawfully effectuated without a vote of the commission, the executed contract is void ab initio. *Allied Delivery System Co.* The award stands without OSFC approval, leaving the next area of inquiry whether the actions of Tri–Village in rejecting Monarch as a nonresponsible bidder and awarding the contract to Peterson resulted from an abuse of discretion.

### Factual Findings Regarding Actions of Tri–Village in Determining Monarch to be a Nonresponsible Bidder on March 15, 2002, and Voting to Award Contract to Peterson

{¶ 90}   As to its initial March 15, 2002 award of the bid to Peterson and rejection of Monarch as a nonresponsible bidder, the court finds that Tri–Village acted primarily on the advice of Turner in making its determination. The one exception to this finding is that Tri–Village's superintendent, Dr. Lucien Szlizewski, independently telephoned the superintendent of a previous OSFC project at Paint Valley Local Schools for which Monarch was the general trades contractor. Tri–Village's superintendent thereafter set forth specific reasons why the school board should reject Monarch's bid (See Ex. 16 and 18.) The court was able to question Dr. Szlizewski about the conversations he had had prior to the board's rejection of Monarch's bid as nonresponsible on March 15, 2002, as well as to test the credibility of Dr. Szlizewski's testimony by corroborating it with that of other witnesses such as Turner's on-site project manager, John Cissell, and Dennis Humbel, Turner's project executive who oversees OSFC projects for which Turner is the construction manager. According to the Project Agreement (Ex. 1), it is OSFC that selects the construction manager and enters into an agreement negotiated by OSFC for construction management services. According to the Construction Management Agreement (Ex. 2) and the Project Agreement, Tri–Village is "an intended third-party beneficiary" of the Construction Management Agreement, so as to permit Tri–Village to obtain full performance of the construction manager's obligations under the Construction Management Agreement. (Ex. 1, at VII.B.)

{¶ 91}   Dr. Szlizewski is a school superintendent and not a construction professional. He justifiably relied on Turner in recommending that Tri–Village through its school board accept Turner's recommendation of March 15, 2002 (Ex. 17), that Peterson's bid be accepted, and that Monarch be deemed a nonresponsible bidder. The court further finds that the Tri–Village school board was justified in relying on the recommendations of its superintendent as set forth in Ex. 19, which exhibit was transmitted to Tri–Village school board members on March 14, 2002, prior to March 15, 2002. The court further finds that Tri–Village

appropriately, and in accordance with law, through resolutions adopted at open meetings, determined Monarch to be nonresponsible and voted on March 15, 2002, to award the contract to Peterson. However, once again, OSFC, in approving Tri–Village's actions of March 15, 2002, failed to comply with R.C. 3318.30, when Cihangar Calis, an OSFC project administrator, caused a letter to be sent to Dr. Szlizewski that OSFC approved of Tri–Village's decision to reject the lowest bidder, Monarch, for the general trades contract of the Project. This time, not only did the commission not vote in approval of the school district's motion, not even the executive director signed the letter. Instead, the letter was signed by a secretary for Calis, and failed in its content to approve the award of the contract to Peterson; it only approved rejecting Monarch.

### Factual Findings Regarding Actions of Tri–Village in Notifying Monarch that it was Found Not Responsible and the Actions of Tri–Village and OSFC in Conducting the Protest Meeting and Subsequently Affirming their Earlier Decision and Approval Respectively

{¶ 92} On March 15, 2002, Tri–Village, via correspondence to Thomas Butler, President of Monarch, sent a letter by certified mail to Monarch notifying Monarch of the following:

{¶ 93} "Based upon the information obtained by the district's construction manager and architect from others concerning the company's performance, the district has consulted with the Ohio School Facilities Commission and determined that Monarch Construction Company is not a responsible bidder for the Project.

{¶ 94} "* * *

{¶ 95} "Section 3.6.1 of the Instructions to Bidders for the Project requires that the district inform Monarch Construction Company in writing of its finding that the company is not responsible, along with the reasons for the finding. *Monarch Construction Company has been determined not to be a responsible bidder based upon conduct and performance issues, management skills, and ability to execute the contract properly.*" (Emphasis added.) (Ex. 20.)

{¶ 96} The "reasons" given by Tri–Village to Monarch in its March 15, 2002 notification were statutory findings as enumerated in R.C. 9.312 and bases for determining responsibility as set forth in 3.6.1 of the Instructions to Bidders. (Ex. 5 and 53.) It was from this notice that Monarch was to protest Tri-Village's finding of nonresponsibility within five days. R.C. 9.312.

{¶ 97} Monarch responded to Tri–Village's notification by letter of March 19, 2002, from its counsel sent to Dr. Szlizewski with a protest (Ex. 31) of the Tri–Village board's determination, and it requested a hearing, pursuant to R.C. 9.312 and section 3.6.2 of the Project Manual (Ex. 5 and 53). In the protest, counsel

for Monarch stated, "Notwithstanding the clear directives of the specifications and the statute, your notification is procedurally defective in that it fails to set forth, with the specificity required, the reasons for your finding."

{¶ 98}   R.C. 9.312 requires that "[a]n apparent low bidder found not to be responsive and responsible shall be notified by the state agency or political subdivision of that finding and the reasons for it."   That statute further provides that "[t]he factors that the state agency or political subdivision shall consider in determining whether a bidder on the contract is responsible include the experience of the bidder, his financial condition, his conduct and performance on previous contracts, his facilities, his management skills, and his ability to execute the contract properly."   These statutory factors are incorporated into section 3.5.2 of the Instructions to Bidders contained within the Project Manual (Ex. 5 and 53), and the protest procedure of the statute is incorporated into section 3.6.3 of the same.

{¶ 99}   The court has reviewed the transcript of the protest meeting that was made at the expense of Monarch.   The protest meeting took place April 3, 2002, at the offices of OSFC in Columbus.   Counsel for all parties, except Peterson, were in attendance.   Also in attendance were Randall Fischer, Crystal Canan, Alan Foust, and Cihangar Calis, all from OSFC;  Lucien Szlizewski and Kirk Falkner (school board president) from Tri–Village;  Terry Liette from F/H, the architect for the Project;  Dennis Humbel, John Cissell, and Dave Holt from Turner;  and Tom Butler and Doug Grandstaff, along with their counsel's paralegal, Vicki Turner, for Monarch.   Over the objections of Monarch and its counsel, the OSFC had refused to subpoena witnesses, have an independent hearing officer conduct a hearing, or to have witnesses sworn.   All of these were expressly denied to plaintiff Monarch by OSFC through Crystal Canan.   When Monarch's counsel attempted to call Dennis Humbel as its first witness, Canan stated to counsel that "we would rather not have a cross-examination process at this point."   (Ex. 41, at p. 17, l. 20–24.)

{¶ 100}   From the outset and during the course of the meeting on April 3, 2002, Monarch through counsel tried to learn "what exactly it is that caused us to be determined nonresponsible."   (Ex. 41, p. 18, l. 6–7.)   When counsel for Monarch asked that Dennis Humbel be sworn, the request was refused, and counsel for Tri–Village stated, "We would expect anyone in this room to be telling the truth at all times.   * * * It's not a hearing.   But I'm sure that Mr. Humbel has no intention of lying.   Mr. Humbel, why don't you go ahead and outline your reasons for recommendation for nonresponsibility."   (Ex. 41, p. 19, l. 17–18;  p. 20, l. 6–11.)

{¶ 101}   At the protest meeting of April 3, 2002, Dennis Humbel stated that previous work Monarch had completed at Paint Valley "we heard from all our

sources" did not go well. Humbel stated that "it was not finished in a fashion that was really fit and ready for the owner to move into. But the owner did, in fact, move in." (Ex. 41, p. 20, l. 18–23.) Humbel stated that, according to the architect and the owner, Monarch had problems in the management of and coordinating of their subcontractors. (Ex. 41, p. 21, l. 1–3) Humbel stated erroneous facts, such as one of Monarch's supervisors, Bob Bailey, had been pulled off the job at Paint Valley to work on another job, and that there were 3,000 punch list items for which "to this day" the punch list was not complete. He also stated that Turner had done some research on other projects of Monarch and had heard some similar comments, "but not to the extent that we heard them from Paint Valley." (Ex. 41, p. 21, l. 4–22.)

{¶ 102} Humbel also cited that Monarch had not attended any of two scheduled walk-throughs or the non-mandatory prebid conference at the school, intimating that this was necessary for a "quality bid." Humbel acknowledged that "we were told that someone had shown up—I think it was on a Saturday and the gate was closed." (Ex. 41, p. 22, l. 5–18.)

{¶ 103} Third, Humbel mentioned that Monarch did not have enough qualified people it could dedicate to the job at Tri–Village. "If what happens on Tri–Village like what happened at Paint Valley, when Bob Bailey was pulled off, we're concerned that that might be a reason why that project didn't go well. * * * When I reviewed that with the board, I tried to stick to the facts, as I'm doing today. In fact, I did stick to the facts. The reality is a great deal of discomfort, as a result of what I just said, by the board of education, and Monarch's understanding of the job, commitment to the project with their qualified staff, availability of their staff. That summarizes it." (Ex. 41, p. 22, l. 19–21; p. 23, l. 5–21.)

{¶ 104} Prior to rejection by Tri–Village as a responsible bidder, Monarch had been aware that there were questions about its bid, because of a conversation that occurred between Tom Butler, Monarch's president, and Dennis Humbel (of Turner, the construction manager) on March 13, 2002.[20] As a result of that

---

20. {¶ a} The remaining bid packages were also recommended in that same document (Ex. 38). Consistent with that recommendation, the school board prepared a Resolution for the award of Contracts 7–13, noting in the "WHEREAS" clause:

{¶ b} "The Construction Manager * * * prepared the attached joint letter of recommendation with the Architect recommending the award of the contracts for bid packages Nos. 7–13, including alternates 3–13 as applicable to each contract."

{¶ c} At 4:00 p.m. on the afternoon of March 12, Dennis Humble, the Project Executive on Construction Management projects for Turner, advised John Cissell, Turner's on-site project manager, that the recommendation to Monarch was being "pulled." As Cissell testified, that was the first time he had heard about Paint Valley. Paint Valley is one of the projects for which Monarch had been the general trades contractor for another OSFC project. Monarch

conversation, and at Humbel's request, Butler had replaced Matt Grandstaff as project manager for Monarch with Doug Grandstaff, of whom Humbel said, "I think Doug is a qualified guy." Humbel acknowledged that Monarch had made this change at his request. (Ex. 41, p. 22, l. 21–22; p. 24, l. 9–11) (Ex. 30—letter of March 14, 2002, from Tom Butler to Dennis Humbel, indicating staffing for project, which included Doug Grandstaff as project manager.)

{¶ 105} At the protest meeting, Grandstaff informed the group that every job he had done so far had been on schools, some of which were not associated with OSFC (e.g., in Kentucky and the University of Cincinnati). (Ex. 41, p. 27, l. 18–21.) Counsel for Tri–Village was afforded the opportunity to question Grandstaff on the punch list at Paint Valley in some detail. Answers elicited revealed that the only remaining punch list items were an already completed item, a new item and a third item that the construction manager had informed Monarch did not need to be completed, but the architect said he wanted done anyway. (Ex. 41, p. 30, l. 10–19.)

{¶ 106} In regard to other staff proposed by Monarch for the Tri–Village Project, Humbel stated in regard to a question about background checks for John Mass, a proposed Monarch construction superintendent, "It wasn't just me. But, yes, we made some phone calls, primarily Wright Patterson Air Force base, to get some information about John. But we really were not able to get information from anybody we talked to specific about John." (Ex. 41, p. 32, l. 16–32; p. 33, l. 1.) Humbel stated that Tom Kerth from Turner, who is in charge of purchasing for Turner, made some calls for Humbel. (Ex. 41, p. 33–34, l. 19–1.) Humbel stated further, "I think Paint Valley was first. But I also believe, from the information that I had, that Doug did do some work on Paint Valley but wasn't the key person. It was Bob Bailey. * * * Well, I was trying to do due diligence * * *; we weren't trying to keep score and grade Monarch on their overall performance on all projects. We were really focused on their capabilities of doing Tri–Village. * * * But Paint Valley, again, was the project that was identified as one that was similar to this job. And at the same time we were— great deal of discomfort as to why that project did not go well. * * * Site visit is extremely important. * * * It's important to put a bid together, very important * * * If Paint Valley was out of the picture, yes [site visit] would have affected it [our recommendation]. * * * There are other concerns about other projects. Adena is a project that we recognize that Jake Grooms [superintendent of schools] wrote a letter of recommendation. We also recognize that the punch list is still not complete." (Ex. 41, p. 35, l. 21–24; p. 36, l. 15–20; p. 37, l. 5–0; p. 38,

---

agreed to furnish to Turner the particular staff individual he requested, Douglas Grandstaff, and followed that the next day with correspondence (Ex. 30).

l. 7–11; p. 40, l. 12–17.) Crystal Canan added at the protest meeting that Humbel's concern about the "amount of qualified labor" Monarch has to staff Tri–Village goes to "management skills and ability to execute the contract properly." (Ex. 41, p. 40, l. 2–24.)

{¶ 107} Monarch has completed construction projects for schools totaling over half a billion dollars in projects since 1963. Monarch is a construction company that does about $70 to $75 million dollars of construction work annually and operates within a 100–mile radius of Cincinnati, the company being based in Cincinnati. (Ex. 41, p. 42, l. 15–24.) In Monarch's last ten consecutive projects with the Army Corps of Engineers, Monarch has been given the outstanding performance rating, and this work has consisted of new building, renovations, design build work, and straight general contractor work. (Ex. 41, p. 42–44, l. 10–6.) Monarch was also selected as contractor of the year for the Army Corps of Engineers in 2000 for the Great Lakes and Ohio River Division, and in 1996 received the Army Corps of Engineer's contractor of the year, worldwide. (Ex. 24.) Defendants Tri–Village and OSFC had this information before them at the protest meeting.

{¶ 108} A prior OSFC project completed by Monarch for the Huntington School District had both renovation and new construction. (Ex. 41, l. 10–11.) The Huntington project was "renovation throughout the entire building. We gutted areas. Again, it was phased where we would take areas, renovate them, turn them over. The school was operated the entire time this was going on. * * * And there was also a new construction wing on the * * * project." (Ex. 41, p. 53, l. 12–20.) Neither Dennis Humbel nor Dr. Szlizewski performed the same level of "due diligence" regarding Huntington that they did with Paint Valley, and the construction starting dates on the two projects were just nine months apart. (Ex. 27.)

{¶ 109} Monarch's president, Tom Butler, addressed Humbel's misstatements about the removal of Bob Bailey from the Paint Valley project. "[T]he superintendent being removed from the Paint Valley project, Bob Bailey, I fought like hell to keep Bob Bailey on the project. Smoot Construction came to me—there were personality conflicts between Bob Bailey and their construction manager—and, in effect, demanded that we remove Bob. * * * Bob was not removed from Paint Valley on our volition. Opposite, we wanted to keep him there. * * * There was personality issues between the project manager from Smoot [Paul Campbell] and Bob Bailey, and we were asked to solve it and we did." (Ex. 41, p. 61–62, l. 16–12.)

{¶ 110} Butler further stated that Doug Grandstaff was Monarch's project manager at Scioto Valley School District, which project was underway, and he was also to be used at Tri–Village, "he's currently capable of overseeing two

projects at the same time." (Ex. 41, l. 12–13.) The court notes that Paint Valley's school superintendent, Philip Satterfield, testified at trial that Paint Valley was the "stepchild" between the two projects that Doug Grandstaff earlier simultaneously managed for Monarch, Paint Valley and Adena. Doug Grandstaff testified at trial that he maintained his management trailer for both projects at Adena, but the two school construction projects were twenty minutes apart by automobile travel.

{¶ 111} Satterfield acknowledged on cross-examination that a personality conflict had existed between Paul Campbell and Bob Bailey at Paint Valley and that Bailey was removed from the job at the request of the construction manager Smoot. Satterfield stated on cross-examination that at Paint Valley, (1) architects' fees were a problem that slowed work down, (2) the sprinkler contractor (not a subcontractor of Monarch) had to be taken off the job due to bankruptcy, and this delayed the ceiling grid installation, (3) change orders from the owner were late in the project, i.e., after August 6, 2001, $396,000 in change orders were issued to Monarch, when the school move-in date was August 24 or 25, 2001, (4) Smoot (Paul Campbell) was not approving full payment for pay applications by Monarch as the contractor, until finally OSFC had to order Campbell to release the funds to Monarch, but Satterfield did not agree with releasing the money, and architectural drawing changes were made to the construction plans delayed bid solicitation by the school district.

{¶ 112} Satterfield testified that specific problems with Monarch included masonry having to be torn out and rebuilt, demolition being started one day early while staff still occupied part of the building, Grandstaff had promised he would be on-site two to three days per week, which promise was not kept (except Grandstaff testified that after Bob Bailey was removed from the worksite, Grandstaff was there two to three days per week), and generally that Monarch did not take care of its subs, i.e., get the work done right in a timely manner.

{¶ 113} Despite his testimony at trial, Satterfield testified that he relayed the following information to Humbel when he was contacted about Monarch: (1) work that was self-performed by Monarch was good work (i.e. work not performed through subcontractors), (2) Satterfield did not believe that Monarch managed its subcontractors, and (3) Satterfield would not want to use Monarch again. He indicated he also made the latter statement to Dr. Szlizewski of Tri–Village. There is no evidence that he relayed any other information than this to Humbel or Szlizewski when either of them called him.

{¶ 114} Doug Grandstaff, who has only worked on school projects (totaling fifteen) since he has been with Monarch (since 1997), testified in regard to Monarch's work at Paint Valley that it is construction superintendents who are required to be at a project site full-time, and not project managers, because their

responsibilities differ. He repeatedly stated that he needed his telephone, his fax, and his computer to do his job as a project manager for a construction project, especially in the beginning stages of a project.

{¶ 115} Grandstaff identified Ex. 26, which was created in response to Ex. 18 (Szlizewski's memo to the Tri–Village board of March 14, 2002). In discussing Ex. 26 (summary of Paint Valley School Evaluation—a document created by Monarch apparently for the protest meeting), Grandstaff indicated that there was a seven-month delay prior to Paint Valley's bid advertisement, costing Paint Valley $250,000 (Ex. 26); after the contract award, Monarch received a notice to proceed October 14, 1999, but the contract was not executed until January 3, 2000, after $693,313 of work had been installed (Ex. 41, p. 190, l. 3–8) (Ex. 26) (and after Tom Butler had had to write a letter threatening to stop work if the contract was not signed [trial testimony, May 8, 2002]); after meeting with the construction manager (Paul Campbell) at Paint Valley in November 1999, a construction schedule from the manager was not received for another four months (trial testimony, May 8, 2002); walls removed because of masonry subcontractor problems amounted to approximately 3 percent of the total block (reported by architect for Paint Valley as "one-third"—which was actually one-third of the wall built at the time grouting problems were discovered, not total project wall) (Ex. 41, p. 198, l. 8–22) (Ex. 26); fire protection prime contractor filed for bankruptcy (not a subcontractor of Monarch, but rather, a separate prime contractor) (Ex. 41, p. 199, l. 7–17) (Ex. 26); and the "schedule-based" payment method resulted in constant deficit in owner payments to Monarch, causing difficulty with Monarch subcontractors and their filing several liens until Monarch paid subcontractors for work it had not yet been paid for by Paint Valley and OSFC. (Ex. 41, p. 201, l. 6–13.) (Ex. 26.)

{¶ 116} Change orders from the Paint Valley school district were a problem, in that the price quoted became stale due to four-month delays between a quote and a purchase order for the same, and some of these were $300,000 to $400,000 in magnitude. (Ex. 41, p. 200, l. 18–23.) (Ex. 26.) (Trial testimony 5/8/2002.) Also, once Bob Bailey was taken off the job at Smoot's request, Doug Grandstaff was on-site at Paint Valley at least two days per week. (Trial testimony 5/8/2002.)

{¶ 117} A punch list is created from a walk-through of the construction project with the project architect and consists of items to be finished at or near the end of construction. Monarch had requested a walk-through with the architect November 9, 2001, but Paint Valley's architect (Kevin Harrison was the architect's representative for the Paint Valley project) delayed two months in making a final inspection, and this delayed the completion of punch list items. (Trial testimony of Doug Grandstaff 5/8/2002.) The painting of school lockers

had been taken off the work order by the school district and the price credited to the district by Monarch. This item later appeared on the punch list. (Trial testimony of Doug Grandstaff 5/8/2002.)

{¶ 118} Dennis Humbel's "due diligence" efforts on behalf of Turner, the construction manager, that supported reasons for recommending that Tri–Village reject Monarch as nonresponsible were woefully inadequate. Under R.C. 9.33, Turner by law had "substantial discretion and authority" as to all phases of the project, including the bid evaluation phase. Turner had been construction manager for this project for nearly a year by the time the general construction contract bids were opened. Humbel, for Turner, received the assistance of other staff at Turner and was not left to manage the bid evaluation process by himself. Moreover, according to Turner's contract with OSFC (Ex. 2) and F/H's contract with Tri–Village (Ex. 3), Turner was to be aided in this task by F/H, the architect for the Project. F/H attended the scope review meeting only the day following the bid opening on March 5, 2002, yet F/H was able to "concur" in Humbel's March 15, 2002 recommendation to Tri–Village. (Ex. 17.)

{¶ 119} There is further evidence that Turner's "due diligence" efforts lacked uniform standards, and that can be found by examining the evaluation forms that Turner created for interviewing past OSFC project principals with whom Monarch had worked.[21] Turner interviewed persons associated with Monarch's OSFC projects at Paint Valley, Huntington, and Adena, completed OSFC projects. (See Ex. 9A, B, and C.) The interview process completed by Dennis Humbel was to generally ask the interviewees about Monarch's work at the particular site, not asking the specific questions on the form and not asking for a rating according to the form. Rather, once Humbel finished talking to these interviewees, he took his own impression of what they said and completed the evaluation himself.

{¶ 120} When Monarch learned of this after having been notified of being rejected by Tri–Village and obtaining documents prior to the protest meeting of April 3, 2002, Monarch presented the same evaluation forms to the superintendents of Huntington and Adena and asked them to self-complete the forms without any assistance from Monarch. (Ex. 23E and F.) A comparison of the self-completed forms for these superintendents with those completed by Dennis Humbel for Turner (Ex. 9B and C) evidences that Turner's subjective evaluation of Monarch is significantly lower than the ratings given to Monarch by the

---

21. The court notes that similar, additional documentation provided for Peterson after the fact with respect to Peterson were two evaluations filled in by Turner employees, on two other projects for which Turner was construction manager. No evaluations of non-Turner projects were submitted. These two Turner evaluations were executed on March 21 and March 22, 2002, after the March 15, 2002 meeting of the school board. Ex. 15(A) and 15(B).

persons themselves whom Humbel interviewed and then determined his own scoring decisions.

{¶ 121}   More disturbing is the fact that Ex. 9A, the form Humbel used for Paint Valley, does not have the question contained on all the other forms in Ex. 9, that is, "Would you recommend this contractor for future OSFC work?"  This form is a computer-generated form, and it is clear from the appearance of the form in 9A that the question has been deleted, as the lower border of the page on which this question should appear is higher than on Ex. 9B and C.  Whatever Turner's motive for excluding this question, the court will not speculate.  The "due diligence" process was performed only by Turner, not by OSFC, not by Tri–Village (with the exception of a single telephone call by Szlizewski to Satterfield prior to the first rejection of Monarch on March 15, 2002), and was based on such inconsistent standards and unreliable hearsay upon hearsay.  The court finds no fixed rules or standards or adequate determining principle underlying Humbel's recommendation to Tri–Village that Monarch was not a responsible bidder.  The court finds that Tri–Village [22] and OSFC relied on Turner's recommendation in both rejecting Monarch on March 15, 2002, and in evaluating Monarch's protest and the plethora of information Monarch submitted at the meeting held at OSFC offices in Columbus April 3, 2002.

{¶ 122}   The protest meeting lasted in excess of four hours.  At trial Dr. Szlizewski admitted that he would have followed Turner's recommendation either way, and that it did not matter if he (Szlizewski) was at the protest meeting or not.  There is no evidence that the Tri–Village School Board obtained a recommendation to reject Monarch and award the contract to Peterson from any other source than Dr. Szlizewski.[23]  For all intents and purposes Turner was the de facto decision maker in determining whether Monarch was deemed responsible by Tri–Village in awarding the general trades construction contract for the Project.  OSFC staff, in reviewing the second decision of Tri–Village to find Monarch a nonresponsible bidder and award the general trades contract to Peterson, applied an "abuse of discretion" standard when determining whether to send a letter approving of Tri–Village's contract award.  (Ex. 48, p. 2.)[24]  The

---

**22.**   {¶ a}   The Resolution of the school board (Ex. 19) contained the following language:

{¶ b}   "The contract for the General Trades bid package was based upon the recommendation contained in the letter dated March 15, 2002 from the Construction Manager."

**23.**   While the Tri–Village school board president, Kirk Falkner, attended the protest meeting of April 3, 2002, he did not speak at that meeting.  Only Dr. Szlizewski spoke for Tri–Village at that meeting.

**24.**   {¶ a}   Crystal Canon stated to Randall Fischer in Ex. 48:

{¶ b}   "We recognize the facts of each situation are subject to debate and interpretation and therefore I do not base this recommendation on any single circumstance or conclusion,

basis for OSFC's purported approval of Tri–Village's decision to reaffirm its earlier decision was a nebulous "overall" standard, consistent with Dennis Humbel's rambling explanation at the protest meeting of why Monarch was determined by the construction manager to be nonresponsible.

{¶ 123} The scope review meetings that occurred March 6, 2002, with Monarch and with Peterson as the lowest and second lowest bidders were vastly different.[25] Little substance was asked of Monarch at the scope review meetings, and Doug Cissell, Turner's representative, remarked on how his father, an iron worker, had worked for Monarch previously and that he knew Monarch.[26] Not many questions were asked of Monarch. The scope review meeting was not typical of what Monarch had experienced in the past. Cissell did not ask for a list of subcontractors (and only subcontractors' names whose contract bids were $250,000 or more were required to be provided), although Monarch volunteered the names of its masonry and steel fabricator subcontractors and indicated that it would do its own scope review with its subcontractors. Cissell asked for resumes of the persons from Monarch who would be staffing the job. Monarch requested until Monday to provide the resumes of such staff, and Cissell agreed to that submission date. A partnering meeting was scheduled for March 15, 2002. Cissell instructed Monarch to bring its list of subcontractors to the partnering meeting. The rest of the meeting was more in the nature of socializing.

{¶ 124} Monarch's bid preparer, Marty Meisberger, attended the scope review meeting, along with Monarch president, Tom Butler. Meisberger has been with Monarch for nine years, is a full-time estimator with a degree in engineering from Purdue University, and has bid on over 400 projects for Monarch collectively worth $2 billion dollars. At the scope review meeting, Meisberger informed John Cissell that Meisberger made a site visit to Tri–Village on a Saturday

---

but rather our *overall impression of the responsibility of Monarch from all the various experiences that are within our discretion to evaluate.* Based on *the original recommendation of the Construction Manager and Architect,* the information presented by Monarch at the protest meeting, and our own observations and experience, I recommend you affirm the earlier determination that Monarch is not a responsible bidder for the reasons of their prior conduct and performance, deficiencies in their management skills and their ability to execute the contract properly." (Emphasis added.) (Ex. 48, p. 2.) (See, also, Ex. 41, transcript of protest meeting, at p. 170–171.)

25. At the outset, the court notes that the scope review document from Turner reflecting its scope review meeting with Monarch was typed after the fact, having been taken from handwritten notes, while Peterson's is handwritten. (See Ex. 41, at p. 107, l. 7–8, and Ex. 8 and 13.)

26. This was the first scope review meeting Cissell had ever conducted for Turner on an OSFC project. (Ex. 41, p. 120.)

(which was not on a scheduled walk-through date.)[27] The specifications for the project call for a "site evaluation."

{¶ 125}  Meisberger described the extent of his site visit and evaluation:  he reviewed the site on the north side of the building;  he reviewed the brick on the newer gymnasium and the brick and stonework on the front of the building;  he looked in the windows and down the hallways to observe the conditions of the rooms and hallways;  he examined the chimneys;  he drove around to the other construction entrance;  and he stated that he reviewed everything until he was comfortable with the site before he left it.  His goal in the site visit was to ascertain that what he saw at the building was represented in the drawings.

{¶ 126}  On cross-examination, Meisberger stated that he looked through all the windows he could on the first floor but that there was a substantial amount of building where he could not see through the windows.  However, Meisberger testified that he could ascertain from the drawings, themselves, the amount of plaster work needed in a particular room.[28]  Don Bergfeld from Peterson testified that the second and third floors of the school building to be renovated were not significantly different from the first floor in regard to plaster patching needed.

{¶ 127}  The court finds that the site visit performed by Monarch through Marty Meisberger, its estimator, was sufficient to constitute a site evaluation as is required by the bid documents.

{¶ 128}  The court notes another disturbing fact about this bidding process. There was apparent concern on the part of Turner that Monarch did not approach Turner with questions during the bid phase.  Don Bergfeld from

---

27. The transcript of the protest meeting of April 3, 2002, contains the statement from Crystal Canan of the OSFC that the "instructions to bidders did not address a site visit * * *; the addendums communicated to the bidders that the project was open for the bidders to evaluate the site.  But attending the prebid meeting is voluntary.  We know not to make that mandatory in case there are some emergencies that come up with companies."  (Ex. 41, at p. 39.)

28. As an estimator, Meisberger stated that he computes price by unit measure, that is, the work is quantified by area of wall space to be plastered and type of repair work needed (e.g., patching versus covering with sheetrock/drywall).  Meisberger testified that the drawings were sufficiently detailed to allow him to do this without walking through each room of the three-story school.  He stated that, from his site visit, he could see that everything he viewed was represented in the drawings.  Meisberger viewed this project as "pretty straightforward" and indicated that it was clear to him from the drawings what the architect wanted.  He stressed that "you have to bid what's on the documents."  Although Monarch did not submit questions during the bid process, Meisberger received addenda that were issued during the bid process, and these addenda clarified the Project, based on questions from other bidders. Meisberger stated that Monarch was not going to self-perform the plaster work.  Meisberger stated that he was able to obtain quantification of plaster work by, e.g., price per square foot from Monarch's plaster subcontractor and quantify from the architect's drawings the total area to be repaired to determine the cost of the work.

Peterson stated that Peterson submitted fifty to one hundred questions, both in writing and by telephone during this time. There was no requirement that such questions and answers to them (and these questions were directed to Turner) be shared with all bidders. Since this was a competitive bidding situation, it would have been more appropriate for questions to be submitted in writing (e.g., by electronic mail) or by telephone (to a recorded voicemail line) with *all* questions and answers to them accessible to *all* bidders. Bergfeld testified that when questions submitted were substantial and called for the issuing of addenda to the bid specifications, addenda would be issued. Marty Meisberger testified that the plans for bids are routinely submitted to local blueprint "rooms," where subcontractors and potential contractors can obtain a copy and register for copies of any addenda. That this addenda process was not followed by Turner, but, rather, that Turner, who would be in effect the sole evaluator of the bids, could be approached and communicated with at any time prior to the opening of the bids with questions about the bid, is troublesome. The court notes that John Cissell, Turner's project manager for Tri–Village, was on site at Tri–Village during the bidding phase (because earlier phases of the Project, such as site preparation, were already underway) and prior to the opening of bids, and was very accessible to bidders, including Peterson.

### Conclusions of Law Regarding Actions of Tri–Village in Notifying Monarch that it was Found Not Responsible and the Actions of Tri–Village and OSFC in Conducting the Protest Meeting and Subsequently Affirming their Earlier Decision and Approval Respectively

{¶ 129} As noted earlier, the court finds the recent Tenth District Court of Appeals case, *Cleveland Construction,* supra, to be instructive in reviewing the facts of this case. In *Cleveland Construction,* the nature of the contract at issue was a public contract awarded by DAS to build at the Ohio State University, the Max Fisher College of Business. Cleveland Construction, Inc. was the low bidder, but the contract was awarded to Danis Building Construction Company, with DAS finding Cleveland Construction not to be a responsible bidder.

{¶ 130} The court found that an unsuccessful bidder must prove by clear and convincing evidence that the award disputed constituted an abuse of discretion and resulted in some tangible harm to the public in general, or to the bidder individually. *Cleveland Construction.* To warrant injunctive relief, there must be a showing that there is an unreasonable, arbitrary, or unconscionable attitude on the part of the contracting authority. Id. The court noted that this would include the arbitrary use of unannounced criteria, but this does not include time constraints that may limit investigation methods. Id. Research of public projects with respect to a bidder is an acceptable means to obtain an idea of a bidder's experience on projects similar to the bid at issue. Id. It is not arbitrary

to give more weight to telephone conversations regarding past performances of bidders than to written recommendations, which does not constitute an abuse of discretion. Id. There is no requirement that the DAS director has to personally make the responsibility determination. Id.

{¶ 131} Significant factual differences between *Cleveland Construction* and this case are that Cleveland Construction's record was replete with testimony regarding dissatisfaction on the part of owners with its performance under past contracts. The only reliable evidence of difficulty in performing a contract by Monarch is the testimony of Dr. Satterfield regarding the Paint Valley school project, and what the court may consider is limited to what he told Dennis Humbel from Turner. That is the only information that Turner and Tri–Village had before it, except for Satterfield's single telephone conference with Dr. Szlizewski, which, again by the evidence, is limited. While Crystal Canan stated in Ex. 48 that she had attended a meeting at Paint Valley and was aware of some of the problems there, nothing further is in the record. Moreover, Tri–Village and the OSFC staff had before it significant mitigating factors that appear to have been completely ignored by Dr. Szlizewski for Tri–Village, Dennis Humbel for Turner, and the staff of the OSFC, who approved Tri–Village's second decision using an erroneous standard for abuse of discretion.

{¶ 132} More important, however, is the fact that a *committee* in the *Cleveland Construction* case determined responsibility in awarding the bid to the second lowest bidder. Here, while Turner attempted to make it appear that way, it was Turner, and solely Turner, who performed the responsibility determination, and Tri–Village unequivocally relied on Turner's recommendation. OSFC took the position that it was to review Tri–Village's award only for an abuse of discretion standard that does not comport with the standard set forth in *Cleveland Construction.* The "abuse of discretion" standard applied by OSFC in reviewing Tri–Village's award decision is vastly different from that required by *Cleveland Construction.* OSFC held plaintiff Monarch to this standard at the protest meeting in error, and thereafter in approving Tri–Village's ultimate decision to reject Monarch and award the contract to Peterson.

{¶ 133} It should also be noted that in *Cleveland Construction,* the appellate court was reviewing the trial court's decision on the same abuse of discretion standard that the court applied to the actions of DAS. The appellate court recognized that the issues of credibility and weight of the evidence belong to the trial court, the trier of fact. This court compared the testimony of Dennis Humbel, Tom Butler, Marty Meisberger, Doug Grandstaff, Pete Crusse, Don Bergfeld, and Kevin Harrison. Comparing the credibility of these witnesses, the court finds that Monarch supplied to Tri–Village and OSFC staff significant information that calls into question the standards used to review Monarch and

determine for a second time that Monarch was nonresponsible and should be rejected as such, even though it was the lowest bidder.

{¶ 134} The court specifically finds, as to the notice provided Monarch by Tri–Village (Ex. 20), that no *reasons* were specified.[29]  *Factors* set forth in R.C. 9.312 were specified, but no supporting reasons that could be effectively addressed at a protest meeting were supplied, and this, in itself is a failure to comply with the mandate of R.C. 9.312, and renders the award process defective.

{¶ 135}  In *Kokosing Constr. Co. v. Dixon* (1991), 72 Ohio App.3d 320, 326, 594 N.E.2d 675, the Second District Court of Appeals examined the awarding of public contracts by municipal corporations and found that, "While municipal corporations are vested with broad discretion in matters related to public contracts, that discretion is not limitless.  A municipal corporation can abuse its discretion when the award of a public contract is based on nebulous or nonexistent standards."

{¶ 136}  The court in *Kokosing* cited *Dayton ex rel. Scandrick v. McGee,* supra, at 359, 21 O.O.3d 225, 423 N.E.2d 1095 (also cited by the Tenth District Court of Appeals in *Cleveland Construction*), in which the Ohio Supreme Court examined a municipal bidding evaluation process that favored resident bidders. In *Scandrick* the Ohio Supreme Court stated:

{¶ 137}  "The evil here is not necessarily that 'resident' bidders are preferred but that there are absolutely no guidelines or established standards for deciding by how 'many percentages' a bid may exceed the lowest bid and yet still qualify as the 'lowest and best' bid.  *Absent such standards, the bidding process becomes an uncharted desert, without landmarks or guideposts, and subject to a city official's shifting definition of what constitutes 'many percentages.'  Neither contractors nor the public are well served by such a situation.*

{¶ 138}  "* * * *The presence of standards against which such discretion may be tested is essential; otherwise, the term 'abuse of discretion' would be meaningless.*"  (Emphasis added.)

{¶ 139}  When Tri–Village failed to provide reasons and provided only statutory factors, this was not sufficient.  R.C. 9.312 requires first that, in a competitive bidding situation for a public contract, the contract be awarded to the lowest bidder.  The lowest bidder will retain the presumed contract award if it is also

---

29.  It was only after Monarch requested through its counsel public records from the government entities, that Monarch was able to address specific reasons for its rejection by Tri–Village and OSFC.  The court finds it somewhat amazing that Monarch was able to perform the Herculean task it did to assemble so much information so quickly, Yet, that information went largely ignored by Tri–Village and OSFC at the protest meeting and thereafter in affirming their earlier decisions.

found to be (1) responsive, and (2) responsible. R.C. 9.312 sets forth factors for determining responsibility, but the decision maker must test the facts it finds using reasonable discretion against the statutory standards set forth for responsibility.

{¶ 140} A low bidder found to be nonresponsible is entitled to protest that finding and to be provided "reasons" for the finding of nonresponsibility. To allow this bidder to test itself against the standards in an attempt to refute the findings, the government decision maker must supply reasons for why it believes those standards have not been met. No reasons were supplied by Tri–Village in its notice to Monarch. Cases within the state of Ohio and outside the state of Ohio support this court's finding that reasons must be given by the government decision maker. *E. Ohio Gas Co. v. Pub. Util. Comm.* (1976), 45 Ohio St.2d 86, 74 O.O.2d 197, 341 N.E.2d 585 ("It is essential to the integrity of the administrative process, to judicial review of administrative action, and to the assurance of comprehension of agency orders by the parties and the public, that the reasons prompting such orders be explicitly stated."); *State ex rel. Kidd v. Bd. of Trustees of the Police & Firemen's Disability & Pension Fund of Ohio* (1991), 66 Ohio App.3d 647, 585 N.E.2d 930 (agency must explain reasons behind its decision); *Am. Trading Transp. Co., Inc. v. United States* (C.A.D.C.1988), 841 F.2d 421, 424 ("an adequate statement of reasons would entail 'canvassing the competing comments received and explaining why it resolved the differences as it did.'" citing *Indep. United States Tanker Owners Comm. v. Lewis* [C.A.D.C. 1982], 690 F.2d 908, 923; *Dunlop v. Bachowski* [1975], 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377) ("A statement of reasons must be adequate to enable the court to determine whether the Secretary's decision was reached for an impermissible reason or for no reason at all."). Id. at 573–574, 95 S.Ct. 1851, 44 L.Ed.2d 377; *Bagdonas v. Dept. of Treasury* (C.A.7, 1996), 93 F.3d 422 (statement of reasons need not include detailed findings of fact but must inform the court and the petitioner of the grounds for decisions and the essential facts upon which the administrative decision was based, quoting *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.* [1983], 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443); *Maxey v. Califano* (C.A.4, 1979), 598 F.2d 874, 876 ("The bald conclusion, unsupported by reasoning or evidence, is generally of no use to a reviewing court.").

{¶ 141} Even when specific reasons were finally aired by Turner at the protest meeting, the reasons were like shifting dunes of sand, providing no firm footing for Monarch to successfully build a defense or explanation for the ultimate decision makers, Tri–Village and OSFC.

{¶ 142} All parties agree that the public and the taxpayers of Ohio have a vital interest in having public contracts awarded according to the laws of the

state of Ohio and the advertised terms and conditions contained in the bid documents.[30] This very precept presumes that fairness is valued in the process of awarding public contracts. Abuse of discretion may involve an unconscionable attitude or one that is fundamentally unfair. *Trupp*, supra.

{¶ 143} The court finds the process used by Tri–Village by which it was determined that Monarch was a nonresponsible bidder, undertaken in reliance on the investigation of sorts performed by Turner, and the approval process thereafter of the OSFC, to be fundamentally unfair.[31] The OSFC approves contracts and the rejection of bidders without votes of its members, without rules, and essentially at the discretion of an executive director who is unbonded, takes no oath, and has, for all intents and purposes, unlimited discretion. The executive director of the OSFC chooses construction managers who, by law (R.C. 9.33) have "substantial discretion" as to "all phases" of the school construction project, including the bid phase. Tri–Village relies essentially en toto on the "substantial discretion" of a construction manager such as Turner, who is subject to the unlimited discretion of the executive director of the OSFC.

{¶ 144} Turner conducts its bidder responsibility in abrogation of its contract with the state, receiving little or no participation from the school district's architect, yet indicates that the nonresponsibility recommendation is made with the concurrence of the architect. Turner completes performance questionnaires, not by reading the questions to and recording the answers from principals who have previously worked with Monarch on similar school projects, but on a subjective impression of a single individual, Dennis Humbel, who, after holding discussions with these individuals, fills out the form himself.

{¶ 145} Monarch is adjudged nonresponsible on the basis of essentially *one* prior project (Paint Valley, where there were admitted "personality conflicts"), the failure by its estimator to visit the site on a weekday when the school is in session, vague statements about Monarch's prior performance on other OSFC projects, the failure to provide a list of subcontractors that was not required, and

---

30. In determining whether the failure to comply with a statute governing bids for the construction of schoolhouses renders a proceeding invalid, the Ohio Supreme Court in as early as 1923 stated: "The purpose of the statute is doubtless to enable school boards to have the schoolhouses and other structures under their control erected and maintained at the lowest cost to the public consistent with the best material and workmanship. To that end doubtless, power was given the board. * * * If any discretion is granted to the board, the phraseology of the statute, employing language mandatory in character, leaves that discretion to be exercised only within the limited degree permitted by the statute." *Perkins v. Bright* (1923), 109 Ohio St. 14, 17–18, 141 N.E. 689.

31. Moreover, awarding a contract based on base price bid, and only at the time of contract award taking into account the price of alternates, is questionable at best. As discussed, an unintended result may be to award a contract to a bidder whose base price is the lowest, but overall, after selection of alternates, may actually not be the lowest bidder.

staffing concerns that were addressed prior to rejection as a result of a scope review meeting in which substantive discussion about the contract was nearly nonexistent. Moreover, none of the above reasons was supplied to Monarch as is required by R.C. 9.312 in the notice of rejection for nonresponsibility, leaving Monarch in a prejudiced and substandard position to adequately present information at the protest meeting, which was largely ignored by the government decision makers who were required to comply with the terms of the statute for a fair competitive bidding process.

{¶ 146} *Cleveland Construction* requires that the process for rejecting Monarch as the lowest bidder must be free of an unreasonable, arbitrary, or unconscionable attitude. The court finds as a matter of law that Tri–Village's superintendent's statement that nothing had changed its superintendent's mind at the protest meeting, along with his trial testimony that he would have relied on Turner's decision, no matter whether it changed with the information Monarch presented at the protest meeting, and that it did not matter whether the superintendent was at the protest meeting, constitutes an irrational approach to deciding Monarch's status as to responsibility. Such an approach or attitude is therefore unreasonable. *Cleveland Construction.*

{¶ 147} Turner's methods of determining responsibility were arbitrary, being without adequate determining principle and not governed by fixed rules or standards. This was especially demonstrated by inconsistent evaluation forms between prior OSFC projects, completed by the same representative of Turner, Dennis Humbel, and the means by which Humbel's evaluation forms of Monarch were completed.

{¶ 148} When Turner's forms were compared with forms actually supplied by Turner to the persons previously interviewed and when these forms were independently completed by them, the resulting differences are significant evidence of arbitrariness by Turner in evaluating Monarch on prior OSFC projects. This was evident from the information presented at the protest meeting. All of this information that Monarch submitted was supplied by the superintendent to the individual members of the board of education of the Tri–Village Local School District prior to their second vote on April 9, 2002, affirming their earlier rejection of Monarch as a responsible bidder and awarding the general trades construction contract to Peterson.

{¶ 149} Finally, the overall approval process, where the executive director of the OSFC operates with essentially unlimited discretion checked by no vote by the voting members of the OSFC; where Turner, the construction manager, is essentially the sole actor in investigating whether a bidder is responsible; and where the school district such as Tri–Village significantly relies on the construction manager and who fails to state reasons for rejecting Monarch,

demonstrate that the approval process, in which a protest meeting is statutorily provided, is not a fair process. *Kokosing* at 326, 594 N.E.2d 675. It is unconscionable. Having found these attitudes and resulting attributes to exist in the process of finding Monarch nonresponsible, the court finds by clear and convincing evidence that both Tri–Village and the OSFC abused their discretion in finding Monarch nonresponsible and awarding the contract to Peterson.

### Taxpayer Action of Ronald Koetters

{¶ 150} "A taxpayer has sufficient interest to maintain an action to enjoin public officers from the commission of acts in excess of legal authority and requiring the expenditure of public money." *Green v. State Civ. Serv. Comm.* (1914), 90 Ohio St. 252, 253, 107 N.E. 531.

{¶ 151} Even without legislation, "a taxpayer has a right to call upon a court of equity to interfere to prevent the consummation of a wrong such as occurs when public officers attempt to make an illegal expenditure * * *; a taxpayer can not bring an action to prevent the carrying out of a public contract or the expenditure of public funds unless he has some special interest therein by reason of which his own property rights are put in jeopardy." *Tiemann v. Univ. of Cincinnati* (1998), 127 Ohio App.3d 312, 321, 712 N.E.2d 1258. In other words, the taxpayer must have a special interest in the funds derived from some type of taxation. Id.

{¶ 152} Plaintiff Koetters has pled in paragraph 2 of the complaint that he is a resident and taxpayer of the state of Ohio and that he has purchased a series of revenue bonds issued by the state to pay for the expansion of school facilities by OSFC and repaid through funds generated by taxpayers. There is insufficient evidence for the court to determine whether taxes already paid by Koetters have been used to begin to repay the bonds or whether the terms of these bonds he has purchased call for repayment using taxpayer funds at a time in the future.

{¶ 153} The taxpayer claim fails to state a claim upon which relief can be granted, as has been affirmatively pled by the defendants herein. While plaintiff Koetters may have standing at some point as a taxpayer (and not solely as a bond investor), the ripeness of his claim has not been proved, and his taxpayer claim is therefore DENIED.

### Injunction

{¶ 154} An unsuccessful bidder may bring an action for injunctive relief against a contracting authority when it is alleged that a contract was unlawfully awarded to another bidder. *Wilson Bennett,* supra; *CB Transp., Inc. v. Butler Cty. Bd. of Mental Retardation* (1979), 60 Ohio Misc. 71, 13 O.O.3d 382, 397 N.E.2d 781. To prevail on a complaint seeking injunctive relief with respect to the award of a public contract, the plaintiff must prove, by clear and convincing

evidence, that the award of the contract (1) constituted an abuse of discretion and (2) resulted in some tangible harm to the public in general, or to the plaintiff individually. *Wilson Bennett,* supra; *W.C.I. v. Ohio Bldg. Auth.* (Aug. 4, 1994), Franklin App. No. 93APE11–1583, 1994 WL 409780.

{¶ 155} As the Ohio Supreme Court has noted, whether to grant an injunction is a matter solely within the discretion of the trial court, and the reviewing court will not disturb the trial court's judgment in the absence of an abuse of discretion. *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt.* (1995), 73 Ohio St.3d 590, 653 N.E.2d 646, at paragraph three of the syllabus.

{¶ 156} The remedy of injunction is unusual and should be granted only when there is no adequate remedy at law. *Wilson Bennett, Inc. v. Greater Cleveland Regional Transit Auth.* (1990), 67 Ohio App.3d 812, 588 N.E.2d 920; *Oberhaus v. Alexander* (1971), 28 Ohio App.2d 60, 57 O.O.2d 107, 274 N.E.2d 771. "* * * 'The proof necessary to support the granting of an injunction must be clear and convincing, and the right thereto must be clear and established by the strength of plaintiff's own case and not by the weakness of defendant's case.' * * *" *Wilson Bennett,* supra, at 821, 588 N.E.2d 920, quoting *White v. Long* (1967), 12 Ohio App.2d 136, 140, 41 O.O.2d 200, 231 N.E.2d 337.

{¶ 157} The court recognizes that Peterson may have made certain commitments based upon its belief that it entered into an existing contract with Tri-Village School District. However, the court has found that any contract claimed by Peterson is void ab initio. In *Pincelli v. Ohio Bridge Corp.* (1966), 5 Ohio St.2d 41, 34 O.O.2d 55, 213 N.E.2d 356, the court was confronted with a county bridge contract for which the county failed to follow competitive bidding principles. In *Lathrop Co. v. Toledo* (1966), 5 Ohio St.2d 165, 172, 34 O.O.2d 278, 214 N.E.2d 408, the court noted that no recovery can be had by either party. The court will leave the parties and the transaction where it finds them.

{¶ 158} While Peterson has indicated the existence of purchase orders with subcontractors for the Project, the only current language in the documents of Peterson is an intent to issue a purchase order not a purchase order itself. (Ex. I.) While certain of the quotations are signed by Peterson, no proof was presented at the hearing that those quotations were then returned to the contractor involved to consummate a contract that would be affected by the voiding of general trades contract for the Project with Peterson. Don Bergfeld, Peterson's president, testified at the trial that should that contract be struck down, he intends to seek relief from Tri–Village.[32]

{¶ 159} The activities of the defendants Tri–Village and OSFC in this action are not only in violation of the statutes on competitive bidding, and hence are void

---

32. The affidavit of Dennis Humble defending against any temporary restraining order that might be issued (Ex. 45), according to his trial testimony, was prepared on April 9, 2002, the

as a matter of law, these defendants adversely affected Monarch in a manner that cannot be compensated for by monetary damages. The court finds by clear and convincing evidence that the activities of these defendants, if not enjoined, will result in irreparable injury to plaintiff Monarch, which facts include, but are not limited to the statement of Kevin Harrison, the architect's representative for the construction project at Paint Valley Schools, that he would never recommend Monarch for another contract with OSFC. Further, plaintiff Koetters, a graduate and master's degree holder of the Massachusetts Institute of Technology in engineering and the founder of Monarch, stated at trial that, with this nonresponsibility finding, the business formula Monarch now uses cannot be used under circumstances where Monarch will be previously labeled with a finding of nonresponsibility. Testimony at trial from Monarch's representatives indicates that this has an effect on even its relationship with its subcontractors and the prices that they may quote Monarch in order for Monarch to bid on future projects.

{¶ 160} This, taken in conjunction with R.C. 9.312, requiring that more than one prior contract or construction project be considered in determining bidder responsibility, demonstrates the impact upon the ability of Monarch to remain a viable business entity as it has been for the nearly forty years it has been in existence. The court also notes the decision of the Tenth District Court of Appeals in *Leaseway Distrib. Centers, Inc. v. Dept. of Adm. Serv.* (1988), 49 Ohio App.3d 99, 550 N.E.2d 955, and that monetary damages would seldom be permitted in such projects. See, also, *Hardrives Paving & Constr., Inc. v. Niles* (1994), 99 Ohio App.3d 243, 247, 650 N.E.2d 482. The court finds that Monarch has met its burden of establishing irreparable injury by clear and convincing evidence. It is therefore

{¶ 161} ORDERED that the actions of defendants Tri–Village and OSFC in rejecting Monarch as a nonresponsible bidder and awarding the general trades contract for the construction and renovation of the Tri–Village K–12 Additions and Renovations in New Madison, Ohio, are hereby declared pursuant to R.C. Chapter 2721 to be improper and invalid as contrary to law, as is prayed for in paragraph D of the plaintiffs' complaint. It is further

{¶ 162} ORDERED that plaintiff Ronald Koetters' taxpayer action is hereby DISMISSED for failure to state a claim upon which relief can be granted, there

---

evening the school board at Tri–Village gave final approval to awarding the contract to Peterson, and this was prior to the filing of this litigation. It would appear to the court that Tri–Village anticipated litigation over its contract award to Peterson. The court would expect that, at the very least, the "rush" to have Peterson sign the contract the same evening as Tri–Village voted to award it the contract (following the protest meeting of April 3, 2002) was an indication to Peterson that the contract may be subject to review by a court.

being insufficient evidence to prove that Koetters has a present claim to relief. It is further

{¶ 163} ORDERED that defendants Tri–Village Local School District and the Ohio School Facilities Commission are hereby permanently enjoined from awarding the general trades contract for the construction and renovation of the Tri–Village K–12 Additions and Renovations in New Madison, Ohio, to Peterson Construction, Inc. and from compensating Peterson Construction, Inc. with funds that are to be used for the aforestated construction project, unless such award and/or compensation is pursuant to a rebidding of the general trades contract of the project and Peterson's bid complies with the requirements of R.C. 9.312 as Peterson being the lowest, responsive, and responsible bidder. It is further

{¶ 164} ORDERED that the defendant Tri–Village shall EITHER award the general trades contract for the construction and renovation of the Tri–Village K–12 Additions and Renovations in New Madison, Ohio, to Monarch Construction Company via a determination that Monarch's bid complies with the requirements of R.C. 9.312 without rebidding the contract, or defendant Tri–Village shall rebid the contract. It is further

{¶ 165} ORDERED that the Ohio Attorney General's Motion Pursuant to Civ.R. 21 to dismiss her as a party filed April 30, 2002, is hereby GRANTED. It is further

{¶ 166} ORDERED that defendant Tri–Village's WITHDRAWAL of its Motion to Transfer Venue filed April 23, 2002, is hereby JOURNALIZED. It is further

{¶ 167} ORDERED that defendant Peterson's Motion to Intervene filed April 22, 2002, is hereby deemed MOOT, and the Clerk is further ORDERED to release said motion. It is further

{¶ 168} ORDERED that the court's granting on the record of the Motion of Defendants OSFC and Tri–Village to Consolidate Hearing on the Application for a Preliminary Injunction with the Trial on the Merits, filed April 29, 2002, is hereby JOURNALIZED. It is further

{¶ 169} ORDERED that defendants Tri–Village and OSFC's counterclaim against plaintiff Monarch Construction Company is hereby DISMISSED sua sponte by the court. It is further

{¶ 170} ORDERED that the court shall prepare its own judgment entry herein in the interest of causing timely action to be able to be taken by any and all of the parties as a result of this decision.

{¶ 171} IT IS SO ORDERED.

Judgment accordingly.